INDUSTRIAL & GENERAL TRUST, Limited, v. TOD et al.

(Supreme Court, Appellate Division, Second Department. June 5, 1900.)

1. RAILROAD—REORGANIZATION COMMITTEE—AGREEMENT—PURCHASE OF ROAD—PLAN OF REORGANIZATION—CONDITION PRECEDENT—PROMISE OF PLAN TO BONDHOLDER—LETTERS—ADMISSIBILITY—COMMITTEE'S GOOD FAITH.

Where, under a railroad reorganization agreement, a committee is to submit a plan of reorganization before purchasing the property, and in ample time before the sale to enable the committee to formulate such plan a bondholder writes to the committee asking when the plan may be expected, and the committee answers that no plan has yet been adopted, but

that they have not forgotten his request to be advised of it in advance, and the committee then purchases the property at foreclosure had under the mortgage securing the bonds, without formulating a plan and without notice to the bondholder, and uses his bonds to pay therefor, and deeds the property to a new corporation, the committee's reply is admissible in the bondholder's subsequent suit against it for converting his bonds, as bearing on the committee's good faith and the claim that the bondholder ratified its action.

2. SAME—PERFECTING PLAN BEFORE PURCHASE—COMMITTEE'S PROMISE—EVIDENCE—VERDICT—EFFECT.

Where a dispute exists between a railroad bondholder and the agent of a reorganization committee as to whether the agent informed the bondholder that the property would not be sold at foreclosure under the mortgage securing the bonds until a plan of reorganization had been perfected, and in the bondholder's suit against the committee for converting his bonds by using them to purchase the road the jury find for the bondholder, the verdict will be taken to have established the truth of the bondholder's testimony that he was so informed, the testimony being material on the question of the committee's good faith.

3. SAME—USE OF BONDS TO PURCHASE—DEEDING TO NEW CORPORATION—STAMPING BONDS—CONVERSION.

Where a railroad reorganization committee uses bonds of the road deposited with it to purchase the property at foreclosure, without having first prepared a plan of reorganization, as required by the reorganization agreement, and then presents the bonds to the commissioner appointed to effect the sale, who stamps on them an indorsement of a part payment resulting by virtue of such purchase, and the committee then sells the property, over the bondholder's protest, to a new corporation, which in turn bonds it, the act of stamping the bonds constitutes a conversion, for which the members of the committee are liable to the bondholder for the value of the bonds.

4. SAME—CONSTRUCTION OF AGREEMENT—COMMITTEE'S POWER—DECEPTION OF BONDHOLDER—ESTOPPEL.

A railroad reorganization agreement provided that the reorganization committee might construe it, and such construction should be final. A bondholder at all times insisted that, under a proper construction of the agreement, the submission of a plan of reorganization to the bondholders was a condition precedent to the committee's use of the bonds to purchase the road at foreclosure sale had under the mortgage securing them. The committee apparently acquiesced in this construction, and led the bondholder to believe that it would act in accordance therewith. Afterwards the committee so used the bonds without notice to the bondholder, and without submitting a plan of reorganization. *Held*, that the committee was estopped to claim that it had in good faith construed the agreement in a manner opposed to the understanding of the bondholder; the provision that the committee might construe the agreement, and that its construction should be final, being operative only in case it acted in good faith.

5. SAME—COMMITTEE AS TRUSTEE—BONDHOLDER'S LETTERS—DEED TO NEW CORPORATION—RATIFICATION.

A railroad reorganization agreement provided that, before the reorganization committee used railroad bonds deposited with it by the bondholders to purchase the road at foreclosure sale, it should submit a plan of reorganization to the bondholders. The committee purchased the road without doing so, and without notice to the bondholders. A bondholder wrote to the committee that under his construction of the agreement the committee held the road as trustee for the bondholders, and that he should object to the committee parting with the property without notice to him and his assent. Afterwards the committee deeded to a new corporation, and used the bonds in payment of its former purchase. About this time the bondholder again wrote to the committee that he was informed that it was about to deed the road to a new corporation, and that under his construction of the agreement the committee had no such author-

ity. *Held*, that the bondholder's letters were not a ratification of the committee's action in using his bonds to pay for the property, which was already in the hands of the new corporation.

6. SAME—CONVERSION OF BONDS—VALUE OF PROPERTY—DAMAGES—PROCEEDS OF SALE—EVIDENCE.

A railroad reorganization committee used bonds of the road to purchase the property at a foreclosure sale under a mortgage given to secure the bonds, and deeded the property to a new corporation. Through the misrepresentations of the committee, the bondholders were not present at the sale. This use of the bonds was held to be a conversion. The price bid by the committee was $500,000, but the value of the property was in excess of this amount. *Held* that, since the initial steps in the conversion were taken before the sale and while the bonds were still a lien on the property, the trial court properly permitted the jury to consider the actual value of the property in fixing damages for the conversion, and that the price realized at the sale was not conclusive as to the value of the bonds.

Appeal from trial term, New York county.

Action by the Industrial & General Trust, Limited, against J. Kennedy Tod and others, to recover for the conversion of railroad bonds. Judgment was rendered below in favor of plaintiff, and defendants' exceptions were ordered to be heard by the appellate division in the first instance. Defendants also appealed from an order denying a motion to set aside plaintiff's verdict. Transferred from First to Second department. Exceptions overruled, and order affirmed.

Argued before GOODRICH, P. J., and BARTLETT, WOODWARD, and HIRSCHBERG, JJ.

Stephen H. Olin and Austen G. Fox, for appellants.
Louis Marshall and Samuel Untermyer, for respondent.

WOODWARD, J. The Birmingham, Sheffield & Tennessee River Railway Company was organized under the laws of the state of Alabama. The work of construction was commenced in 1889. For the purpose of enabling the projectors of this enterprise to carry on the work, the corporation executed a mortgage, dated April 1, 1889, to the Knickerbocker Trust Company of New York, by which all of the corporate property was mortgaged to secure the payment of an issue of bonds to the amount of $25,000 per mile, bearing interest at the rate of 5 per cent. per annum, and maturing April 1, 1929. Bonds were issued to the aggregate amount of $2,975,000. Default in the payment of the interest on the coupons followed some time prior to 1893, and in June of that year the Knickerbocker Trust Company instituted a suit in the United States circuit court for the Northern division of the Northern district of Alabama for the foreclosure of the mortgage held by it. On the 7th day of June, 1893, Edmund A. Hopkins was appointed receiver of all the corporate property. On the 9th of April, 1895, a reorganization agreement was drawn up, by which the defendants, J. Kennedy Tod, Edmund A. Hopkins, and J. G. Leiper, were constituted a committee representing the bondholders, and were given very broad powers to represent those who should become parties to the agreement, and should deposit their bonds with the Manhattan Trust Company. The time for depositing such bonds was limited to the 15th day of May, with power in the committee to extend the time or to receive bonds after that date, in its discretion. The plaintiff, an En-

glish corporation, represented by Mr. Untermyer, in New York, did not file its bonds within the prescribed time, but was afterwards permitted to do so by the committee; the Manhattan Trust Company issuing its certificates of deposit, dated May 29, 1895, for the 570 bonds of the plaintiff, with the unpaid coupons. The reorganization agreement, in so far as it is necessary to an understanding of the questions involved in this action, provides that:

"The bondholders hereby make, constitute, and appoint J. Kennedy Tod, Edmund A. Hopkins, and J. G. Leiper, and their respective successors (to be appointed as hereinafter provided), as the reorganization committee of the railway company; and they hereby constitute the said reorganization committee their only and exclusive attorneys, agents, and trustees, and the attorneys, agents, and trustees of each and every one of them, for the purpose of carrying out this agreement. And the bondholders hereby severally and separately confer upon the said committee whatever power and authority it may be necessary for the committee to exercise in order to legally and efficiently execute the said trust; and they, and each of them, also constitute and appoint the said committee their true and lawful attorneys, irrevocable, to execute on their behalf such instruments in writing, and to do such acts and things, as to the said committee may seem proper to enable it to carry out the trusts created by this agreement in all its parts; hereby giving and granting to the said committee full power and authority to do and perform all and every act and thing which it may deem convenient and necessary to be done in and about the premises, as fully, to all intents and purposes, as the said bondholders might or could do personally, hereby ratifying and confirming all that the said committee shall lawfully do or cause to be done by virtue hereof. The said committee is hereby further expressly authorized and empowered to take such proceedings, give such directions, and institute, or cause to be instituted, any and all such suits or proceedings, as it may be advised by counsel are necessary or proper; to take such steps to secure the sale and conveyance of the property and franchises of the railway company, either by means of existing legal proceedings, or by the institution of a new suit or suits or proceedings, or by negotiation or agreement, or otherwise, as to it shall seem expedient; to enforce the rights of the bondholders and protect their interests in every way that said committee may deem necessary or advisable. * * * The powers hereinbefore given shall not be narrowed or limited by any enumeration of the powers conferred by this agreement."

"Fourth. The committee is hereby expressly authorized and empowered, and it shall be its special duty, to prepare and adopt a plan for the reorganization of the affairs of the railway company, with or without foreclosure. When the committee shall have adopted such plan, a copy thereof shall be lodged with the Manhattan Trust Company. Notice shall thereupon be given to the holders of trust certificates issued hereunder, and such plan shall become binding upon all of the said holders who do not withdraw herefrom (in the manner hereinafter provided), unless the holders of a majority in interest of the said certificates shall within twenty days after such notice file with the Manhattan Trust Company their written dissent from the plan. The notice from the committee to the holders of the trust certificates shall be given by mailing the same, with postage prepaid, to the addresses registered by such holders with the Manhattan Trust Company at the time of depositing the bonds represented thereby. Such registered addresses may, from time to time thereafter, be changed by a notice in writing delivered to the Manhattan Trust Company.

"Fifth. Any holder of a trust certificate issued hereunder may, at any time within thirty days after the mailing to him of notice of the filing of a plan of reorganization as hereinbefore provided, withdraw from this agreement, and receive back the bond or bonds deposited by him, upon payment of his pro rata share of the expenses theretofore incurred by the committee; such payment in no event to exceed one-half of one per cent. of the par value of the bonds and overdue coupons represented by such certificate or certificates. Upon the withdrawal of the bonds represented by such certificate or certificates, and the payment of his pro rata share of the expenses of the committee, as above pro-

vided, the holder of such certificate or certificates shall be thereupon, and without any further act, fully released from the obligations of this agreement and from such plan of reorganization; but, as to every certificate holder who does not within the said period of thirty days withdraw the bonds represented by his certificate or certificates, his assent and ratification of the said plan shall be conclusively and finally assumed, conferred, and given.

"Sixth. For the purpose of effecting a reorganization of the affairs of the railway company, the committee is further authorized to take such steps as it may deem advisable for the formation of a new corporation, or to agree with any other party or parties for the formation thereof, and the committee may take such steps as may be necessary for the transferring to such new corporation all the assets of the said railway company, and for the acquisition thereof by such new company at any judicial sale of such assets or franchises. In case of any sale of any of the franchises or assets of the new company, the committee is authorized and empowered, in its discretion, to purchase the same, or any part thereof, for the account and benefit of the bondholders, at such price as the committee may deem expedient; but the committee shall be under no obligation to effect any such purchase. For such purposes the committee may incur such expenses as it may deem judicious, and may use the bonds deposited hereunder for the purpose of paying for any assets or franchises purchased. If the committee shall purchase the whole or any part of the assets or franchises of the railway company, as hereinbefore authorized, the same may be conveyed to it, or to any such person or persons, or corporation or corporations, as the committee may designate."

"Eleventh. The committee may supply any defects or omissions which it may deem necessary to be supplied to enable it to carry out the general purposes of this agreement. The committee is authorized to construe this agreement, and its construction of the same shall be final," etc.

On the 31st day of May, 1895, Mr. Hopkins resigned from the committee, and since that time the affairs of the committee have been carried on by the defendants Tod and Leiper. On the 1st day of July, 1895, a decree of sale was entered in the foreclosure suit brought by the Knickerbocker Trust Company in the United States circuit court, and a commissioner was appointed, who was directed to sell at auction, after 60 days' notice, no bid to be received for less than $500,000. This decree was entered after a conference between Mr. Rives, of counsel for the committee, and Mr. Stone, representing the Knickerbocker Trust Company. The sale was noticed for September 16, 1895, and, in addition to a notice in Alabama, an advertisement was inserted in the New York Evening Post. In letters under date of May 28th, June 14th, and July 9th, Mr. Untermyer asked Mr. Tod in reference to the plan of reorganization, when it might be expected, etc., and on the 16th of July, 1895, Mr. Tod made reply, in which he said:

"A decree of sale has been entered. The property is now being advertised for sale, and will, I understand, be sold on the 16th day of September. No plan has yet been adopted, and, I am unable to predict the probable date upon which a plan will be issued, but I have not forgotten your request to be advised of it in advance."

There was at the time of writing this letter two months intervening between the date and the time fixed for the sale, and the tone of Mr. Tod's letter indicated that he understood that Mr. Untermyer was to be informed of the provisions of the plan in advance. There was sufficient time to mature a plan, and to give the 30 days' notice to bondholders, before the date of the sale as then fixed; and Mr. Tod's statement that he had "not forgotten your request to be advised of it in ad-

vance" was a fact to be taken into consideration in determining the good faith of the defendants, and the ratification by the plaintiff of the acts of the committee. There is a conflict of evidence as to certain alleged interviews with William Stewart Tod, who appears to have represented J. Kennedy Tod in some degree, between the date of this letter and the sale of the railway company's property, on the 16th day of September. It is insisted by Mr. Untermyer that William Stewart Tod, assuming to act for J. Kennedy Tod, assured him that a sale would not take place until a plan had been prepared and submitted to the bondholders as contemplated by the agreement. This is disputed by William Stewart Tod, and, as it was material upon the questions at issue, the verdict of the jury must be deemed to have established the truth of Mr. Untermyer's version of these interviews; the tendency of which was to show that the committee did not act in good faith in construing the agreement, but, while leading Mr. Untermyer to believe that no action would be taken until the plan of reorganization had been prepared and submitted, was actively engaged in promoting a sale of the railroad, and in closing the door of opportunity to the bondholders. Notwithstanding the assurances of William Stewart Tod to Mr. Untermyer, and the evident understanding of J. Kennedy Tod, the railway was sold on the 16th day of September, the committee purchasing the property at the upset price fixed by the court in its decree of sale, $500,000. Fifty thousand dollars in cash was paid on the day of sale by the committee. On the 15th day of October, 1895, the commissioner filed his report of sale, and on the 29th of the same month the court in Alabama confirmed the sale. Mr. Untermyer had notice of this sale on or before the 30th day of October. On the 22d day of November, 1895, the Northern Alabama Railway Company was incorporated under the laws of Alabama, to operate over the line of the Birmingham, Sheffield & Tennessee River Railway Company; it being necessary, under the laws of that state, to hold the franchise, that the property be transferred to a new company. On the 29th day of November, 1895, the commissioner deeded the Birmingham, Sheffield & Tennessee River Railway property to the Northern Alabama Railway Company, and on the same date the latter company by mortgage conveyed all the property and franchises to the Knickerbocker Trust Company as security for $1,700,000 of bonds. On the 30th day of November, 1895, J. Fred Johnson, the commissioner named in the decree of sale, attended at the office of the Manhattan Trust Company in the city of New York, where all of the bonds, including those of the plaintiff, which had been deposited under the reorganization agreement, were produced and presented to the commissioner, who stamped upon each of them the following words: "New York, 29th November, 1895. 139 76/100 dollars paid on this bond as part of the proceeds of sale under foreclosure. J. Fred Johnson, Commissioner." The bonds were then returned to the Manhattan Trust Company, where they have since remained. Prior to the stamping of these bonds, on the 30th day of November, this being the act which the learned trial court held as a matter of law to constitute conversion, and on the 23d of November, Mr. Untermyer wrote to Mr. Tod, chairman of the committee, in which he says:

"Upon our construction of the agreement, the committee now hold the property which they purchased at the sale, which was had without notice to us, as trustees for the bondholders. If, when the plan is promulgated, it fails to meet with our satisfaction, we are not, in my judgment, relegated to the acceptance of the infinitesimal sum named in the decree as the upset price, which Mr. William Tod seemed to regard as our only alternative. * * * We should certainly object to the committee parting with any part of the property to the new company, or otherwise, without ample notice to us and without our assent."

On the 30th of November Mr. Untermyer wrote to Mr. Tod, saying:

"Information has come to us to the effect that the committee is about to convey the property in its hands to the North Alabama Railway Company, notwithstanding the protest made by me. * * * Will you kindly advise me whether this information is accurate? On our construction of the reorganization agreement, the committee has no such authority."

It is urged by the defendants that these letters are inconsistent with the present attitude of the plaintiff; that they constitute a ratification of the acts of the defendants in purchasing the property at the sale; and that the use of the bonds in paying for the property was but an incident to the transaction, not constituting conversion. If the committee had merely purchased the property of the railway company, and had then promulgated a plan for the reorganization, there might be some degree of force in this contention. The railway property was the foundation of the security for the bonds, and it is not clear how the plaintiff could have suffered any loss by the committee purchasing the property, and holding it in trust for the bondholders. The committee did not, however, stop here. It went forward, and completed the reorganization of the property, turning it over to a new corporation, which in turn transferred the property by mortgage to a trust company, and this in the face of the protest of plaintiff. To use the bonds of the plaintiff to pay for property which had been transferred to the Northern Alabama Railway Company, and by that corporation mortgaged to the Knickerbocker Trust Company, is quite a different thing from using the bonds to pay for property held in trust by the reorganization committee, and we are of opinion that the learned trial court was justified in holding that the transaction on the 30th day of November, 1895, constituted conversion of the plaintiff's bonds. This conclusion is not inconsistent with the rule that a party may waive a rule of law or a statute, or even a constitutional provision enacted for his benefit or protection, where it is exclusively a matter of private right, and no consideration of public policy or morals is involved (Sentenis v. Ladew, 140 N. Y. 463, 35 N. E. 650); because that provision of the agreement which stipulates that the committee may construe the contract, and that such construction shall be final, contemplates that the committee shall act in good faith, and upon questions which are fairly open to construction. The plaintiff all the time insisted that the proper construction of the contract called for the submission of a plan of reorganization as a condition precedent to action on the part of the committee which should take from the bondholders any rights of property. The committee apparently acquiesced in this contention. There was certainly no denial on the part of the committee that the construction put upon the agreement by the plaintiff was the correct one, and the let-

ters of J. Kennedy Tod, as well as the statements of William Stewart Tod, were calculated to leave the plaintiff with the idea that the committee intended to act in accord with this construction of the contract. Under such circumstances, the committee could not go on and make use of the plaintiff's bonds in paying for property which had been turned over to another corporation, and then be heard to claim that it had acted in good faith in construing the contract in a manner to permit of such use of the plaintiff's property. If the committee had informed Mr. Untermyer that its construction of the agreement warranted it in going forward, or had given notice that it intended to act upon such a construction of the agreement, so that the plaintiff would have been in a position to protect itself, it may be that the provision authorizing the committee to construe the contract would have been controlling, but, under the circumstances developed in this case, the rule referred to can have no application.

Neither are the defendants in a position to urge that the plaintiff, through Mr. Untermyer, by letters of November 23d and 30th, ratified the acts of the committee in such a manner as to defeat a recovery in this action. The conversion was consummated when the bonds of the plaintiff were used to pay for property belonging to the Northern Alabama Railway Company, and the plaintiff could lose no rights in the present action by insisting on the 23d of November, and again on the 30th of that month, that the committee held the railroad property in the capacity of a trustee. So long as the railroad property was in the hands of the committee, acting as trustees for the bondholders, no rights of the plaintiff had been impaired, even though the committee had acted in excess of its powers; and a ratification of such action on the part of the plaintiff, which might have justified the use of plaintiff's bonds in paying for the property in the hands of the committee, could not be held to authorize the use of these bonds in payment of property in the possession of a corporation with which the plaintiff had no relations, and especially so when the plaintiff had protested against the committee parting with the property.

The remaining question necessary to be considered upon this appeal is the measure of damages. We have examined this branch of the case with care, and we are of opinion that the trial court did not err in its submission of the case to the jury upon the evidence. The conversion was of the plaintiff's bonds, the value of which was the fair valuation of these securities in their relation to the railroad property on the day of the sale; for the purchase must, under the circumstances, be regarded as one of the steps in the final conversion of the plaintiff's property. The duty of promulgating a plan of reorganization being upon the defendants, as a condition precedent to any action which might interfere with the rights of the plaintiff in its securities, the purchase of the property before such plan was submitted to the bondholders, and its subsequent disposition, coupled with the use of the plaintiff's bonds in paying for property not in the possession of the committee, was all a part of the conversion, which was consummated on the 30th day of November, 1895; and the measure of damages thus became the value of the railroad property represented by the bonds at the time of taking the initial steps in the conversion, and not, as con-

tended by the defendants, the price realized at the sale, where the plaintiff was, by defendants' conduct, deprived of an opportunity to protect its rights by bidding upon the property, or taking such other steps as might have been deemed advisable. The learned trial court permitted the jury to consider the price realized upon this sale in determining the value of the property, in connection with the other evidence offered on the part of both parties, and, as the evidence is sufficient to support the verdict, there is no reason why judgment should not issue in favor of the plaintiff, in accord with the verdict of the jury.

The exceptions should be overruled, and judgment entered in favor of the plaintiff, and the order denying a motion for a new trial should be affirmed. All concur.