THE INDUSTRIAL AND GENERAL TRUST, LIMITED, Appellant, *v.* J. KENNEDY TOD et al., Respondents.

1. CONTRACT — STIPULATION MAKING A PARTY FINAL JUDGE OF HIS OWN ACTS. No one can be made by contract the final judge of his own acts, for the law writes "good faith" into such agreements. No covenant of immunity can be drawn that will protect a person who acts in bad faith, because such a stipulation is against public policy and the courts will not enforce it.

2. RAILROADS — REORGANIZATION AGREEMENT — LIABILITY OF COMMITTEE FOR FAILURE TO ADOPT AND NOTIFY BONDHOLDERS OF PLAN BEFORE FORECLOSURE SALE — STIPULATION THAT COMMITTEE'S CONSTRUCTION OF AGREEMENT SHOULD BE FINAL. Under a reorganization agreement made by the bondholders of an insolvent railway company during the pendency of an action to foreclose the mortgage given to secure the bonds, which agreement conferred upon a reorganization committee, therein named, the legal and equitable title of the bonds for the purpose of reorganizing the affairs of the railway company, together with all the power and authority necessary for that purpose, and required the committee to make and adopt a plan of reorganization and give notice thereof to the bondholders so that any of them might withdraw from the agreement if the plan should not be satisfactory and recover back the bonds deposited thereunder, and authorized the committee to form a new corporation and use such bonds for the purpose of purchasing any of the assets and franchises of the old company for a new corporation, and further provided that the committee might construe its provisions, and their construction should be final, and that no member of the committee should be liable for "anything but his own willful misconduct"— the committee impliedly agrees to prepare a plan and submit it to the bondholders before the property is sold under foreclosure, and their right to take back their bonds if the plan is not satisfactory is vital; the fact that the committee

has power to construe the agreement, and the engagement that its construction shall be final means that it shall be final if the committee acts in good faith; and where by a foreclosure sale of the property before the submission of a plan the bondholder is deprived of this vital right, the action of the committee cannot be considered as taken in good faith, and he may maintain an action to recover any damages sustained thereby.

3. MEASURE OF DAMAGES. The measure of damages in such an action is what the plaintiff has lost; he is entitled to recover the value of his bonds as of the date of the violation of the agreement; where the bonds have had no market value for years, the difficulty of establishing a method of proving their value such as will be just to both parties is enhanced, but is not insuperable; the value of the bonds may be approximately established by showing the intrinsic value of the property upon which they were a first lien, and any circumstance legitimately tending to prove that value is competent; when so established the value of the plaintiff's bonds is the proper proportion of that amount, not exceeding in either case the face of the bonds and interest unpaid.

*Industrial & General Trust* v. *Tod,* 93 App. Div. 263, reversed.

(Argued December 12, 1904; decided January 17, 1905.)

APPEAL from a judgment, entered April 27, 1904, upon an order of the Appellate Division of the Supreme Court in the first judicial department, overruling plaintiffs' exceptions, ordered to be heard in the first instance by the Appellate Division, denying a motion for a new trial and directing that the complaint be dismissed.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Louis Marshall* and *Samuel Untermyer* for appellant. The action is properly brought to recover damages on the law side of the court instead of for equitable relief. (*Marvin* v. *Brooks,* 94 N. Y. 80; *Dykman* v. *Keeney,* 150 N. Y. 483; *O'Brien* v. *Fitzgerald,* 6 App. Div. 509; 150 N. Y. 572; *E. S. S. Bank* v. *Beard,* 81 N. Y. 484; 151 N. Y. 638.) Under the terms of the reorganization agreement the defendants were charged with the duty of formulating a plan of reorganization and giving notice thereof to the depositing bondholders before a sale in foreclosure, and the failure of the

defendants to perform their duty in this respect before the sale and before making use of the plaintiff's bonds constituted a breach of contract. (*Industrial & General Trust* v. *Tod*, 170 N. Y. 233.) The provision that the committee is authorized to construe the agreement and that its construction shall be final is a nullity, and does not operate as a justification or as a defense, or as a permission to the committee to substitute any other contract, arrangement or agreement for that which is embodied in the contract. (*White* v. *M. R. R. Co.*, 135 Mass. 216; *Sanford* v. *C. T. Assn.*, 86 Hun, 380; *D. & H. C. Co.* v. *P. R. R. Co.*, 50 N. Y. 250; *Seward* v. *City of Rochester*, 109 N. Y. 164; *Hamilton* v. *L. Ins. Co.*, 136 U. S. 242; *L., L. & G. Ins. Co.* v. *Wolff*, 50 N. J. L. 453; *Mentz* v. *A. F. Ins. Co.*, 79 Penn. St. 478; *Austin* v. *Searing*, 16 N. Y. 112; *Wicks* v. *Monahan*, 130 N. Y. 232; *D. S. B. Co.* v. *Gadson*, 101 N. Y. 387.) The provision to the effect that no member of the committee shall be liable for the acts of any other member, " nor for anything but his own willful misconduct," does not exempt them from the consequences of their violation of their agreement in the very face of the insistence by the plaintiff that the plan should be formulated before a sale, even assuming that they acted in good faith. (*Cox* v. *Stokes*, 156 N. Y. 491; *U. N. W. Co.* v. *O. W. Co.*, 164 N. Y. 41; *Matter of Young*, L. R. [31 Ch. Div.] 174; *State* v. *Clark*, 29 N. J. L. 98; *Highway Comrs.* v. *Ely*, 54 Mich. 181; *Newell* v. *Whitingham*, 58 Vt. 341; *Fuller* v. *C., etc., Ry. Co.*, 31 Iowa, 204; *Watt* v. *Stephens*, 128 N. Y. 123; *Hewitt* v. *Newburger*, 141 N. Y. 538; *Crabb* v. *Young*, 92 N. Y. 56.) The filing of a plan of reorganization on July 8, 1898, more than six months after the joinder of issue in this action, and nearly three years after the defendants' breach of contract, does not affect the plaintiff's right to maintain this suit. (*Wisner* v. *Ocumpaugh*, 71 N. Y. 113; *Dean* v. *M. E. R. Co.*, 119 N. Y. 540; *Hollingsworth* v. *Flint*, 101 U. S. 591; *People* v. *Bank of North America*, 75 N. Y. 547; *Carpenter* v. *M. L. Ins. Co.*, 22 Hun, 47; *Smith* v. *Hartog*, 23 Misc. Rep. 353; *Parsons* v. *Martin*, 11

Gray, 111; *Rundle* v. *Moore*, 3 Johns. Cas. 36; *Brown* v. *McGraw*, 14 Pet. 47.; *Blot* v. *Borceau*, 3 N. Y. 78; *Jackson* v. *Baker*, 1 Wash. C. C. 394.) Proof as to the condition, cost and value of the railway which constituted the security for the plaintiff's bonds, was competent as an aid to the jury in ascertaining the damage resulting from defendant's breach of contract. (2 Sedg. on Dam. [7th ed.] 403; *Ingalls* v. *Lord*, 1 Cow. 240; *Decker* v. *Mathews*, 12 N. Y. 313; *Potter* v. *Merchants' Bank*, 28 N. Y. 641; *Booth* v. *Powers*, 56 N. Y. 22; *Thayer* v. *Manley*, 73 N. Y. 305; *Atkinson* v. *R. P. Co.*, 43 Hun, 167; 114 N. Y. 168; *Griggs* v. *Day*, 136 N. Y. 152; *State* v. *Carpenter*, 51 Ohio St. 83; *B. F. T. & Sav. Co.* v. *H. L. Co.*, 118 Mo. 447; *Hewitt* v. *Steele*, 118 Mo. 308.)

*Stephen H. Olin* for respondents. It appears both by the complaint and by the proof that there was no cause of action for damages but at most only a right of action in equity. (*Marvin* v. *Brooks*, 94 N. Y. 80; *Husted* v. *Thomson*, 158 N. Y. 328; *Weldon* v. *Brown*, 84 App. Div. 482.) No breach of the agreement was shown. (*N. C. Bank* v. *Toplitz*, 178 N. Y. 467; *Dolcher* v. *Fry*, 37 Barb. 152.) The complaint was properly dismissed because no breach was shown of the reorganization agreement as construed by the committee to whom by the agreement the right of construing it was given. (*White* v. *Wood*, 129 N. Y. 527.) As no act or omission of the defendants was shown which amounted to willful misconduct, the defendants were not liable in this action. (*Van Siclen* v. *Bartol*, 95 Fed. Rep. 793; *Crabb* v. *Young*, 92 N. Y. 56; *White* v. *Wood*, 129 N. Y. 527; 142 N. Y. 656; *Venner* v. *Fitzgerald*, 91 Fed. Rep. 335; *Spurr* v. *United States*, 174 U. S. 728; *Wass* v. *Stephens*, 128 N. Y. 123; *Hewitt* v. *Newberger*, 141 N. Y. 538.) No damage was shown. (*Industrial & General Trust* v. *Tod*, 170 N. Y. 247; *Walter* v. *Hangen*, 71 App. Div. 40; *Kidd* v. *McCormick*, 83 N. Y. 391; *B. P. & H. D. Est.* v. *Wharton*, 101 N. Y. 631; *Morton* v. *Harrison*, 20 J. & S.

305 ; *Hamilton* v. *McPherson*, 28 N. Y. 72 ; *Worth* v. *Edmonds*, 52 Barb. 40 ; *Dillon* v. *Anderson*, 43 N. Y. 231 ; *Witherbee* v. *Meyer*, 155 N. Y. 446 ; *Noble* v. *A. T. C. Co.*, 37 Misc. Rep. 96 ; *Allen* v. *McConihe*, 124 N. Y. 347 ; *Masterton* v. *Mayor, etc.*, 7 Hill, 61 ; *Taylor* v. *Read*, 4 Paige, 561.) It appearing that a plan of reorganization was prepared and filed in accordance with the agreement, and that the plaintiff did not withdraw his bonds, his consent and approval to that plan was, under the terms of the reorganization agreement, conclusively given and conferred. (*Styles* v. *Fuller*, 101 N. Y. 622 ; *Howard* v. *Johnston*, 82 N. Y. 271 ; *Cox* v. *Stokes*, 156 N. Y. 491 ; *Jewell* v. *McIntyre*, 62 App. Div. 403 ; *Hallahan* v. *Webber*, 7 App. Div. 122 ; *Gould* v. *C. C. Bank*, 86 N. Y. 75.)

Vann, J.   The facts relating to this controversy have been stated so frequently by different judges during its passage through the courts that we shall allude to them only in a general way. (*Industrial & General Trust* v. *Tod*, 52 App. Div. 195 ; 170 N. Y. 233 ; 93 App. Div. 263.)

The Birmingham, Sheffield and Tennessee River Railway Company was organized to build a railroad, extending from Sheffield, Alabama, to Parish, in the same state, with several short branches leading to mines, and one to the Tennessee river.   The entire length of the main line and all the branches was 119 miles.

It began to build about the 1st of April, 1889, and on or about that day issued its bonds, to the amount of $2,975,000, bearing interest at the rate of five per cent, and secured them by a first mortgage on all its property.   It paid the interest for one year, but then made default, and in June, 1893, an action to foreclose was commenced and a receiver appointed. After the receiver had operated the road for nearly two years an agreement, dated April 9th, 1895, called for convenience the reorganization agreement, was entered into between the most of the bondholders and J. Kennedy Tod, James G. Leiper and Edmund A. Hopkins, who composed the reor-

ganization committee.    Mr. Hopkins, the receiver who was operating the road, resigned from the committee before they took any action and the vacancy thus created was never filled.

The agreement, which was prepared at the request of the committee by their own counsel, conferred almost unlimited powers upon them.    They were authorized to do substantially all that the bondholders themselves could do in order to effect a reorganization of the road, except as mentioned hereafter. Both general and specific powers were granted, but the latter were not to limit the former.    They were empowered to act by the vote of a majority, to fill any vacancy in the committee, to form a new corporation and transfer to it all the assets of the old; to purchase for the bondholders at foreclosure sale and to pledge the bonds to secure money borrowed to pay the purchase price and expenses; to appoint agents and counsel and pay them reasonable compensation for their services; to "supply any defects or omissions" in the agreement which they should deem necessary to carry out its purpose; to construe the agreement and their construction was to be final; to abandon the agreement, provided they returned the bonds, and with the written consent of a majority in interest of the bondholders to "take any action thereon and in addition to" that provided for; they were not "to be liable for the act of any agent or attorney selected with reasonable discretion," and no member of the committee was to be liable for the acts of any other member, or "for any thing but his own willful misconduct."

The bondholders were not to sign the agreement, but were to become parties thereto by depositing their bonds with the Manhattan Trust Company, "subject to the order and full control of the committee to be used for any purpose" under said agreement.    It was provided that "the deposit of such bonds shall transfer to the committee the full legal and equitable title thereto for all the purposes of this agreement," and that they might "use the deposited bonds for the purpose of paying for any assets or franchises purchased."    Upon the deposit of the bonds the bondholders were to receive from

the trust company negotiable trust certificates which were "to be in a form approved by the committee."

The agreement, however, contained some provisions for the protection of the bondholders, as it was made "the special duty" of the committee "to prepare and adopt a plan for the reorganization of the affairs of the railway company with or without foreclosure. When the committee," as it was further agreed, "shall have adopted such plan, a copy thereof shall be lodged with the Manhattan Trust Company.  Notice shall thereupon be given to the holders of the trust certificates issued hereunder, and such plan shall become binding upon all of the said bondholders who do not withdraw herefrom in the manner hereinafter provided, unless the holders of a majority in interest of the said certificates shall within twenty days file with the Manhattan Trust Company their written dissent from the plan.  *  *  *  Any holder of a trust certificate issued hereunder may at any time within thirty days after the mailing to him of notice of the filing of a plan of reorganization, as hereinbefore provided, withdraw from this agreement and receive back the bond or bonds deposited by him, upon payment of his *pro rata* share of the expenses theretofore incurred by the committee."   Upon the withdrawal of the bonds and the payment of the *pro rata* share of the expenses "the holder of such certificate or certificates shall be thereupon, and without any further act, fully released from the obligations of this agreement and from such plan of reorganization; but as to every certificate holder who does not within the said period of thirty days withdraw the bonds represented by his certificate or certificates, his assent and ratification of the said plan shall be conclusively and finally assumed, conferred and given."

Substantially all of the bondholders became parties to the instrument by the deposit of their bonds pursuant to its terms, only twenty-six bonds being unrepresented.  On May 29th, 1895, the plaintiff, an English corporation, deposited 570 bonds of the par value of $570,000 and coupons to the amount of $57,000 and received certificates therefor from the Manhat-

tan Trust Company. This deposit was made after a confer-
ence between Mr. Samuel Untermyer, who represented the
plaintiff from the outset, and the general agent of the com-
mittee, to whom he was referred by a member thereof, as in
" charge of all the matters " and as " running the entire
business." Frequent interviews and some correspondence
followed between Mr. Untermyer, the committee and their
agent in which the former requested and urged and finally,
after the entry of a decree of sale in the foreclosure action,
insisted upon the prompt preparation of a plan of reorganiza-
tion. Shortly after the 27th of June, 1895, the representa-
tive of the committee told Mr. Untermyer that a plan would
be prepared " in ample time to give your clients ample oppor-
tunity either to withdraw their bonds, protect themselves or
come into the plan if they see fit to do so." On the 17th of
July, 1895, the decree having been entered on the fifth, he
was told " that there would be no sale of the property until a
plan was put out and reasonable opportunity given to " the
plaintiffs " to withdraw from it if they did not like it or to
protect themselves." About the first of September, 1895, he
was notified that his clients should have an opportunity to
exercise their rights before there was a sale and that a plan
would be prepared in due time.

Notwithstanding these assurances no plan was prepared.
On the 16th of September, 1895, the property was sold in the
foreclosure proceedings and the defendants, assuming to act
for the bondholders, bought it for $500,000, which was the
lowest bid that could be received under the decree. The sale
was made without the knowledge of Mr. Untermyer, who had
been assured by the committee that it would be postponed,
and on learning that it had taken place he vigorously protested
and pronounced it a great wrong to the bondholders. On the
29th of October, 1895, which was the day before Mr. Unter-
myer first heard that the property had been sold, the sale was
confirmed and on the 30th of November following the defend-
ants used the plaintiff's bonds among others in paying the
purchase price and each bond was stamped by the officer

making the sale as follows, "29th of November, 1895, $139.76 paid on this bond as part of the proceeds of the sale under foreclosure.   J. Fred Johnson, Commissioner."

In a short time the defendants caused the Northern Alabama Railway Company to be incorporated under the laws of the state of Alabama with a nominal capital of $2,000,000. The stock was all held by the defendants and the officers and directors were their nominees.   The articles of incorporation authorized an increase of the capital, upon the vote of the stockholders holding a majority in value, "to the extent of $15,000 a mile for each additional mile of railroad purchased, built, constructed or operated."

Against the emphatic protest of Mr. Untermyer the property was conveyed to the new company, which at once issued bonds, secured by a mortgage, to the amount of $3,000,000. This mortgage, which was dated November 29th, 1895, contained the recital that bonds to the amount of $1,700,000 were issued in part payment for the railroad property and franchises, the remainder being for the general purposes of the company.   A foreclosure was authorized for principal and interest upon the request of a majority of the bondholders in case a default in the payment of interest should continue for three months, whereas the former mortgage authorized a foreclosure only upon the request of two-thirds of the bondholders after nine months' default in such payment.   The mortgage was subject to a judgment for $89,062.06, which by a decree of the court was made a prior lien, superior to that of the mortgage bonds.   Said judgment was rendered in favor of a car trust company for the amount due for the rental of its equipment during the receivership.   The bonds contained the following provision : "Every holder of this bond by receiving the same expressly waives any and all individual liability existing or that may hereafter exist against each and every present and future stockholder or director of the Railway Company."

This action was commenced on the 29th of October, 1897, and on the 18th of July, 1898, nearly three years after the

road had been completely reorganized, the defendants prepared a plan of reorganization and submitted it to the bondholders. The plan recited what had been done by way of reorganizing the road and bonding it, stated the expense incurred and the prospects of the new enterprise and offered to the bondholders under the reorganization agreement 40 per cent in general lien bonds and 60 per cent in stock of the new company. Four hundred thousand dollars in amount of the bonds issued by the new company were "prior lien bonds," the most of which were to be sold to meet the cash requirements of the plan and the rest were reserved for the use of the new company. Of the "general lien bonds," $1,151,600 in amount were appropriated to pay the 40 per cent on the old mortgage bonds and $137,870 to pay the coupons thereon, while the balance of the issue of $3,000,000 was for the construction or purchase of additional lines. The rate of interest on the "general lien bonds" was to be two per cent for two years from July 1st, 1898, then three per cent until July 1st, 1902, and after that five per cent. The interest on the bonds was non-cumulative, but the directors had discretionary power to make it up to a five per cent basis, provided the earnings authorized it and their decision in this respect was to be conclusive on all parties. The new securities offered to the old bondholders are said to be worth $320 per $1,000, that is, for an old bond of the face value of $1,000 securities worth $320 were offered by the belated plan. The plaintiff still holds the certificates issued by the trust company for its bonds deposited under the agreement and produced them at the trial.

This action was originally brought to recover damages for the conversion of the plaintiff's bonds, and upon the first trial the plaintiff had a verdict, which, although sustained by the Appellate Division, was set aside by this court upon the ground that the acts complained of did not constitute a conversion. (*Industrial & General Trust* v. *Tod*, 170 N. Y. 233.) The complaint was subsequently amended on motion by omitting the allegations relating to conversion and alleging

a cause of action for breach of contract. The plaintiff does not disaffirm the agreement, but stands upon it and asks for damages from the committee for the violation thereof to its injury. Upon the trial of the action with the complaint in its present form, evidence was given tending to establish the foregoing facts, among others, but when the plaintiff rested its complaint was dismissed and its exceptions were ordered to be heard in the first instance by the Appellate Division. Upon the review by that court the exceptions were overruled and judgment was directed in favor of the defendants. From that judgment the plaintiff appealed to this court and upon our review we must assume that the jury would have found all the facts in its favor which were warranted by any reasonable view of the evidence.

As the reorganization agreement was prepared by the committee and the language used is wholly their own, it should be construed most favorably to the bondholders, who had no part in preparing it but were compelled to accept it as it was or not accept it at all. (*United Water Works Co.* v. *Omaha Water Co.*, 164 N. Y. 41; *Kratzenstein* v. *Western Assurance Co.*, 116 N. Y. 54.) The respondents claim that no breach of the agreement was shown, because they had the right to construe it and their construction is final by force of its provisions.

If one party to a contract has the unrestrained power to say what it means, the other has no rights except by sufferance. The parties to the contract before us were not in that situation, and human language is not strong enough to place them in that situation. The defendants, with all their power, could not make a new contract, or subvert the agreement by construing a vital provision into or out of it. (*Cox* v. *Stokes*, 156 N. Y. 491, 507.) No one can be made, by contract, the final judge of his own acts, for the law writes "good faith" into such agreements. No covenant of immunity can be drawn that will protect a person who acts in bad faith, because such a stipulation is against public policy, and the courts will not enforce it. The law requires the exercise of good faith, and

15

no matter how strong the provision to shield from liability may be, there is no protection unless good faith is observed. The power to construe and the engagement that the construction shall be final mean that it shall be final if the members of the committee act in good faith, but not otherwise. They were, doubtless, protected from the outcome of errors of judgment and honest mistakes, but good faith is the standard, erected by the law, by which all their acts and omissions are to be judged. (*Shaw* v. *Railroad Co.*, 100 U. S. 605; *Hollister* v. *Stewart*, 111 N. Y. 644; *White* v. *Wood*, 129 N. Y. 527.)

We now reach the primary question on the merits and that is whether the committee impliedly agreed to prepare a plan and submit it to the bondholders before the property was sold under foreclosure. There was no express provision to this effect, and the argument in favor of one by implication rests upon the agreement and the surrounding circumstances. As we construe the instrument, the bondholders had no power to withdraw their bonds until after a plan of reorganization had been prepared and notice thereof given, or until a breach of duty by the defendants. This right to take their bonds back if they did not like the plan was vital to the bondholders. It was about the only right they had, and if they could not exercise it until after the road had been sold and reorganized it amounted to nothing. The deposit of the bonds with the trust company placed them in the absolute power of the committee, which had full control of them for the purposes of the reorganization scheme, provided it was accepted, and the owner had no right to demand them until after a plan had been filed, when he had that privilege for the period of thirty days only. Therefore, unless a plan was made before the sale, the bondholder would have no means of protecting himself, for he could not appear and bid to advantage without his bonds, which, according to the mortgage, could be used toward the payment of the purchase price. From the right to withdraw the bonds within the thirty days, the need of protection at the foreclosure sale and the difficulty, if not the impossibility, of getting it unless the plan was filed before a

sale, together with the futility of filing a plan after a sale, springs the implication that the plan was to be filed before a sale took place, and that the parties necessarily so understood. The defendants, as reasonable men of large experience in affairs, could not, and as their early declarations show did not, understand it otherwise. The sole object of the agreement was to provide a plan of reorganization. Every provision was in aid of that purpose. The plan was to be prepared so that the bondholders could act upon it and decide to remain in the scheme or get out, and necessarily it was intended that they should have time to act upon it and withdraw their bonds, if they so elected, before their rights were prejudiced or concluded by a sale. This at first was the construction of the defendants themselves, for in their conversation and correspondence with the representative of the plaintiff the assurance was repeatedly given that his client should have ample opportunity to withdraw its bonds before a sale. There was no need of a plan after a reorganization had been effected, as the purpose was to furnish a basis for action to be taken with reference to reorganizing the road, subject to the approval or disapproval of the holders of the bonds. If a bondholder approved the plan he was committed to the scheme, but if he withdrew his bonds he could resort to some other means of protecting his interest, such as appealing to others to join with him in a new plan, or bidding himself, or persuading others to bid at the sale. The object of the plan was to reorganize a road which needed reorganization, not a road already reorganized. A plan presented years after a sale was not contemplated by the parties. The sale of the road, the organization of a new company, the transfer of all the assets of the old company thereto, the issue of bonds to a large amount by the new company secured by a first mortgage on its entire property and franchises, accomplished the reorganization of the road, but the bondholders had no voice in it, no privilege of disapproving or of withdrawing their bonds so that they should not be sacrificed. Suppose, after all this, a majority of the bondholders had rejected the plan,

as the agreement authorized, what good would it have done? What rights would they have had left? They were bound and helpless in the hands of the committee, who held them fast until they had reorganized the road on a plan to suit themselves, but which was not made known to the bondholders until it was too late to do them any good. The plan was to be a method of doing something, not a history of something already done. Of what use is a plan to build a house after the house is built? We think there was a covenant on the part of the defendants, necessarily implied from the stipulations of the agreement and the attending circumstances, that they would prepare and submit a plan of reorganization before the road was sold and before the bonds were used, as otherwise there would be no object in having a plan and the bondholders would be unable to save themselves, because their bonds were beyond their control. This was, in substance, the construction placed upon the agreement when the case was here before, as will be seen upon reading the opinions in connection with the syllabus and the vote of the judges. (*Industrial & General Trust* v. *Tod*, 170 N. Y. 233, 270.)

The only other question requiring discussion relates to the measure of damages, which is not without difficulty. Two of the learned justices of the Appellate Division concurred in the judgment dismissing the complaint because "there was no proof of damages." They apparently thought that a cause of action was established in all other respects. Since the defendants violated their agreement by failing to make a plan before the sale and by using the bonds without making a plan, the plaintiff is entitled to recover some damages for the breach of contract, but it is difficult to lay down the method of assessment, owing to the novelty of the facts. The defendants claim that no damages were sustained, because the bondholders now have the road, equipment and franchises, which is all they ever had. This is plausible but unsound. When the agreement was made the bondholders had the first lien on all the railroad property, with the right to reorganize on a basis that suited themselves, by selling out-

right to the highest bidder after fair competition; by combining with some other railroad company, of which several were available, either with or without the extension of the line by new construction; or by the transfer of assets to a new company organized in their own way, with their own directors and officers and the issue of new bonds bearing such interest as they though best, secured by a mortgage upon such conditions as would in their judgment give them the greatest value.  They lost this opportunity through the negligence or omission of the defendants.  They did not consent to the new order of things.  The defendants forced them into a position of utter helplessness and kept them there until they were compelled to accept what they did not want or turn to the courts for relief.  They were not bound to accept or reject an executed plan which was not submitted to them in time to save themselves, or to take any action which would waive the damages for which they had already sued.  They were not obliged to take back their old bonds, which the defendants had mutilated and which had become the obligations of an extinct company and were no longer a lien upon any thing. They were not required to accept their proportion of the sum bid by the defendants upon the sale of the road, for the sale was made in violation of the agreement and was unfair to the bondholders who had no adequate opportunity to raise the price by bidding themselves or inducing others to bid.  Finally, after the damage had been suffered and an action had been commenced to recover the amount, the plaintiff was not bound to accept the new securities, some bearing no interest and the rest interest at a lower rate for a time than the old securities and which were issued by a different company with strange officers and directors, and upon different and doubtful conditions in many respects.  Three-fifths of the amount of their former holdings were to be in stock and only two-fifths in bonds.  The accompanying mortgage not only covers more than twice as many bonds as the old bondholders were to receive, but it is not even the first lien upon the property.  The defendants are in the attitude of trying to

force these bastard securities upon the plaintiff in place of the legitimate bonds which have been rendered of no value by their action. They seek to compel the plaintiff to take what they offer in securities created by themselves, instead of what the old bonds were worth and would have brought if the reorganization agreement had been performed. Even "something just as good" or "worth just as much," if such were the fact, is not what the law awards for the breach of an agreement. Every non-assenting bondholder may well say to the committee *non in hæc foedera veni.* The plaintiff's bonds are destroyed. There is no substitute that it is bound to accept, and unless it submits to the injustice perpetrated upon it by the defendants, as the jury might have found, the recovery of damages in some form and to some amount, if not the only remedy, is a remedy to which it is entitled.

It was not obliged to resort to a court of equity for the courts of law are open to redress the violation of contracts through the constitutional right of a trial by jury. If that remedy is not adequate it is the misfortune of the plaintiff to have selected it, but the defendants cannot complain. If they broke their agreement and damages resulted they must face a jury. They were mere custodians of the bonds, unless they made and filed a plan as required by the agreement, which was never done. They had no right to use the bonds for any purpose until the plan was formulated and the bondholders had been given a chance to withdraw. The provisions of the reorganization agreement in relation to a trust never became operative as to the plaintiff, because they were to take effect only as to such bondholders as stayed in after notice of a plan formed in time to get out in safety. The deposit of the bonds was tentative until full assent was given by remaining in the scheme. If one intrusts property to an agent or bailee, who agrees to do a specified thing with it, but instead he violates his agreement and does something else, the principal is not obliged to accept from the agent what he got through the violation, but may insist that he should pay the value of the property. Moreover, the agent cannot reduce the damages

by offering the property back, provided it has been substantially changed in form and value without authority. It is for the principal to elect whether to sue at law for damages or resort to equity for an accounting. A wrongdoer has no right to select the forum to redress the wrong which he himself inflicted.

The measure of damages is suggested by what the plaintiff has lost. It has lost its bonds without its fault, in spite of its protest and through the action and negligence of the defendants, as the jury might have found. Those bonds no longer exist as securities, for they are a lien upon nothing and are worth nothing except as vouchers. The bonds, as bonds, are gone, and the plaintiff is entitled to recover the value thereof as of the date when the agreement was violated by the defendants. Such a recovery would make good the loss, but as the bonds have had no market value for years, how is the loss to be admeasured? The common law will not halt or surrender because the situation is novel and the ordinary methods of proving values are not available, but will resort to some practical means that will be just to both parties. The bonds were worth something, as was shown by the sale when the defendants made the only bid for the property covered thereby and bought it at the upset price required by the court. These bonds were the first lien upon a going railroad, 119 miles long, with land, depots, rolling stock, wharves and appurtenances. One of its branches touched the Tennessee river at a point from which it is navigable to the Ohio. Through its connections with other roads it reached St. Louis, Cincinnati, Louisville and other northern and western points, as well as places to the south. It ran through a country abounding in mineral, lumber and agricultural products, which furnished much freight. According to the opinion of a witness who was a railroad manager, it could be operated to advantage as a part of either of two extensive railroad systems in the south. It appeared that the gross earnings exceeded the operating expenses and the amount paid for taxes, but not including the annual interest. All these facts were shown at

the trial and the attempt was made to show others of like character, but the court improperly excluded the evidence and the plaintiff excepted.

The value of the bonds was approximately the intrinsic value of the property upon which they were the first lien and the value of the plaintiff's bonds was the proper proportion of that amount, not exceeding in either case the face of the bonds and interest unpaid. Upon proof of the facts, some of which were shown and some excluded by the trial court under objection and exception, showing what kind of a railroad it was, its mileage, grade, curvature and bridges; the number and condition of its locomotives, cars and depots; the quantity and quality of its other property; the population of the towns along its line; the kind of a country it ran through; its connection with other roads; its opportunity for freight and passenger business; what it had earned in the past and its ability to earn in the future and all those elements which enter into the value of a going railroad, it was for the jury to estimate the value of the bonded property according to their sound judgment and draw the proper inference as to the proportionate amount that the plaintiff should recover in order to make good the loss it had sustained. It was entitled to its aliquot part of what the road would have sold for, after due allowance for the reasonable expenses of making a sale. The defendants cannot assess the damages which they are to pay, nor pay them in anything but money.

This method of establishing the value of property which has no market value has received the sanction of the courts in this and other states. (*James* v. *Cowing*, 82 N. Y. 449, 455; *Weigley* v. *Kneeland*, 18 App. Div. 47, 53; *Sloan* v. *Baird*, 12 App. Div. 481; 162 N. Y. 327; *Gallup* v. *Miller*, 25 Hun, 298; *Murray* v. *Stanton*, 99 Mass. 345, 348; *Hewitt* v. *Steele*, 118 Mo. 463, 474; *Redding* v. *Godwin*, 44 Minn. 355, 358; *Storms* v. *Storms*, 51 N. E. Rep. 955; *Hitchcock* v. *McElrath*, 72 Cal. 565, 567; 2 Sedgwick on Damages [7th ed.], 403; 2 Cook on Corporations, § 581; 1 Spelling on Corporations, § 499.)

We think that a case was made for the jury and that the trial court erred both in granting a nonsuit and in excluding evidence tending to show the intrinsic value of the railroad property. The judgment appealed from should, therefore, be reversed and a new trial granted, with costs to abide the event.

GRAY, J. (dissenting). I cannot vote for the reversal of the judgment. I think it was both proper and just. It is difficult to imagine an agreement for the reorganization of an insolvent corporation in the interest of its bondholders, which would more completely surrender all individual rights of control and confer wider powers of management upon the bondholders' committee, than does the one in question. Not only did the defendants acquire the whole title to the bonds deposited under the agreement; but they were authorized to construe it and their construction was to be final. They might supply any defect, or omission, deemed necessary to enable them to carry out the general purposes of the agreement. They were empowered to take such steps as they might deem advisable for the formation of a new corporation and for transferring to it all of the assets of the railway company. They were authorized "to use the deposited bonds for the purpose of paying for any assets or franchises purchased." Without going over, again, the extensive discretionary powers vested by the agreement in the defendants, suffice it to say that there was, apparently, nothing they might not do, in the direction of a reorganization of the insolvent concern and they were without responsibility to their constituents for what they did; except, of course, in the case of some fraud practiced, or of "willful misconduct." There is no charge of either. They chose to enter into such an agreement and if the defendants, as representing them in the effort to protect their interests, have not defrauded them of their just share of the fruits of the joint action, it is not easy to perceive how they have injured them. This action is for a breach of the agreement by the defendants and the pertinent questions, in my opinion, are two-fold. In the first place, is the plaintiff

in a position to bring the action and, in the second place, has it been injured by the failure of the defendants to prepare, and to file, a plan for a reorganization before the sale of the property under the pending decree of foreclosure ?

Answering the first question, I am of the opinion that the plaintiff could not maintain an action at law ; inasmuch as it had not withdrawn its bonds, as the agreement provided for a bondholder doing, if he dissented from the plan, when filed and notice thereof given. There was no express provision that a plan should be filed before the sale was had in the foreclosure action and the plaintiff's bonds remained with the trust company, subject to surrender upon return of the trust certificates and, still, so remain. The fourth article of the agreement provides, with respect to the preparation of the plan of reorganization, that notice " shall be given to the holders of the trust certificates issued and such plan *shall become binding upon all the holders, who do not withdraw herefrom.*" The fifth article provides for a withdrawal of the bonds deposited by a holder, " within thirty days after the mailing to him of notice of the plan," and " as to every certificate holder *who does not withdraw the bonds represented by his certificate or certificates, his assent and ratification of the said plan shall be conclusively and finally assumed; conferred and given.*" There is no dispute about the facts that the advertisement of a sale of the road, pursuant to the decree in the pending foreclosure proceeding, was duly published and that it was known to plaintiff ; that the sale was publicly had and that a notice of the filing of the plan of reorganization, which was, in fact, adopted subsequently to the sale, was received by plaintiff, through its representative. The failure, or delay, to file the plan did not terminate the agreement, nor annul the authority of the committee, and it was incumbent upon the plaintiff, if disapproving of it, to withdraw its bonds within the time provided and thus to evidence its withdrawal from the plan as inoperative and no longer binding upon it.

But, if we shall assume that there was implied on the part of the defendants an agreement that they would prepare, file

and give notice of a plan for reorganization before a sale was had by the master under the foreclosure judgment, and if we, further, shall assume that the plaintiff, notwithstanding its failure to signify its dissent in the way agreed upon, is not precluded from bringing this action to recover damages for the alleged breach of agreement, then I find myself unable to perceive how it has been injured by the defendants' acts. Every bondholder received an aliquot, or proportionate, share of an ownership in the property, upon which he formerly had a lien. There is no pretense of unfairness in the proceedings for, or upon, the sale. It was advertised and publicly held. The property was offered to the highest bidder ; but it was bought in by the committee at the lowest price, which had been fixed by the court's decree, and, then, was held in trust for the bondholders for the purpose, expressly, authorized by the reorganization agreement and eventually executed ; namely, for the formation of a new corporation, to which should be transferred all of the assets of the old corporation. There was an express provision of the agreement for making " use of the corporate bonds for the purpose of paying for any assets or franchises purchased." (Article 6 of the agreement.) The agents for the bondholders, acting in perfect good faith and, obviously, solely, in behalf of their principals, the bondholders, protected their interests by acquiring the mortgaged property at the sale and by substituting for the insolvent corporation a new one, released from its embarrassments, which should be, again, a going concern, managed for its former creditors. As it appears, so successful were the results that the valueless bonds of the insolvent company, by the combination of their holders and by their prompt, concerted, action, were transmuted into securities of a new corporation, which have come to have a value, considerably greater than what the property sold for represented. From possessors of a lien upon the insolvent corporation properties, the bondholders became proprietors in a new corporation and what gave value to their holdings was the reorganization, which had been effected.

Is it conceivable that the plaintiff can, justly, claim to have been substantially damaged? If there was a breach of an implied promise to file a plan before a certain time, to wit: the judicial sale of the road, was it injured? Did it act upon it by withdrawing its bonds? Was it treated otherwise than were treated all others similarly situated and have not its committee, the defendants, delivered over to it its proportionate share in an ownership of the property of its insolvent debtor, as duly admeasured as it was possible in the situation of all interests? Were the plaintiff able to recover as for a conversion by the defendants of its bonds, the usual rule for the measurement of damages applicable would be the amount which the property had brought upon the foreclosure sale; for that would represent its value at the time of the theoretical conversion. Under that rule it would have recovered no more than it did. Is it to be permitted, upon the theory of the breach of an implied promise by the defendants to preliminarily file a plan for reorganization, now, to recover of them larger damages, upon opinion evidence of what such a railroad property, situated as it is, is, or should be worth? The evidence, upon which the opinion of Judge Vann presents so pleasing a picture of possibilities, in a fertile country to be developed, in profitable mineral resources to be worked and in terminals to be reached, is conjectural, if not speculative; but if it represents facts entering into an estimate of present, or prospective, value, has not the plaintiff been placed in a position to enjoy the benefit of them? But the value of the railroad property is not the measure of the value of the bonds; for the mortgage had been foreclosed and a sale made of the property. To allow evidence to be given of the value of the reorganized railroad properties, as a measure of the value of the bonds of the insolvent concern, would be, in my judgment, as grossly unfair, as illegal. The defendants should not be punished, for the plaintiff's benefit, by being compelled to pay a value for its bonds, which is estimated upon results due to events, occurring subsequent to the sale.

In my opinion, it is evident that the plaintiff has not been

injured by the omission of duty, which it charges against the defendants, and the allegation of damage rests upon no substantial foundation. They acted in good faith and for the common interest of all whom they represented. The object of the agreement has been attained and the bondholders, who subscribed it, collectively, own the property, upon which they had a lien, with all of the benefits accruing from its operation through an organization, representing their interests.

For these reasons, as for those given below, I think that the judgment should be affirmed.

Cullen, Ch. J., Bartlett, Haight and Werner, JJ., concur with Vann, J.; O'Brien, J., concurs with Gray, J.

Judgment reversed.