RICHARD A. LEWIS ET AL. *v.* JANON FISHER ET AL.
[No. 55, January Term, 1937.]

*Decided April 8th, 1937.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Frank B. Ober*, with whom were *Milton R. Smith*, and *Ritchie, Janney, Ober & Williams* on the brief, for the appellants.

*John H. Skeen*, with whom were *George Gump* and *Emory, Beeuwkes, Skeen & Oppenheimer* on the brief, for the appellees.

JOHNSON, J., delivered the opinion of the Court.

Appellants herein, who, together with their predecessors, formerly owned two-thirds of the balance of unpaid bonds, totaling $90,000, issued by the Tolchester Beach Improvement Company of Kent County, now the holders of certificates of deposit issued by a bondholders' protective committee to the same extent, appealed from a decree passed by the Circuit Court of Baltimore City, ratifying a sale made by the committee of the property which secured such bonds.

The financial difficulties of the Tolchester Beach Improvement Company became acute in February, 1935, when certain stockholders filed a bill against it in the Circuit Court of Baltimore City, asking that a receiver be appointed. A few days later the company filed a petition in the United States District Court for the District of Maryland, under section 77B of the National Bankruptcy Act, as amended (11 U. S. Code Ann. sec. 207), alleging default in payment of its bond interest due February 1st, 1936, delinquency in paying its taxes and mort-

gage interest, and its inability to pay general creditors, whose claims amounted to around $25,000. By the petition permission was sought to reorganize under the supervision of the federal court, and, although the petition was approved and jurisdiction assumed by that tribunal, it was relinquished approximately one year later after various unsuccessful efforts at reorganization.

The Tolchester Company had outstanding a bond issue of February 1st, 1935, and maturing fifteen years later, the amount due upon which was $90,000. This was secured by a first mortgage or deed of trust, and in that indenture the First National Bank of Baltimore was named trustee.

After jurisdiction had been assumed by the federal court, a bondholders' protective committee, consisting of three persons, was formed and issued certificates of deposit under the terms of a deposit agreement dated February 20th, 1935; the Mercantile Trust Company of Baltimore being therein designated depositary. During the summer of 1936, the property was operated by a receiver, and in September of that year, after efforts at reorganization had failed, the first mortgage upon the property was foreclosed by the trustee, proceedings to that end having previously been taken in the lower court. At the sale, which was held on September 22nd, the property was bought in for $66,000 by the bondholders' protective committee, and as early as May, 1936, all outstanding bonds had been deposited by their owners with the Mercantile Trust Company, the committee depositary. It is undisputed that the purchase was made by the committee on behalf of the bondholders. Most of the bonds were acquired in the open market between May 20th and November 25th, 1936, many of them having been purchased after the attempted sale by the committee of the Tolchester Company's properties. Objections to the sale as reported by the trustee were filed and overruled on November 21st, 1936.

However, during the previous month, the purchaser of the property, the bondholders' protective committee, in-

vited written bids for the whole or parts of the property previously purchased by it. The right was reserved to reject all bids, and on October 21st of that year, the bids previously received were opened, in consequence of which the committee entered into a contract to sell a part of the property to the Chesapeake Steamship Company for $25,-000, and the remainder, including the resort property in Kent County, also the boats, to the Wilson Line, Inc., for $65,000; such combined bids being in the judgment of the committee the highest and best terms received by it for the properties. It might also be stated that, in its attempt to secure bids, the committee did not advertise the property, but contented itself with mailing twelve circular letters asking for bids, and that, while the sale of the wharf property in Baltimore to the Chesapeake Steamship Company in the amount of $25,000 was to be for cash, of the $65,000 bid by Wilson Line, Inc., for the remaining properties, only $10,000 was payable in cash; it being the plan to secure the remainder of $55,000 by a five per cent. interest-bearing first mortgage on the resort property located in Kent County, amortized over a period of fifteen years. In addition thereto, the Wilson Line, Inc., agreed to make a cash contribution of $1,600 toward the expenses of the committee.

Promptly upon the ratification of the foreclosure sale, appellants notified the committee of their desire for it to take title to the property in the name of a corporation, and distribute the securities to them *pro rata*, in accordance with the provisions of the deposit agreement, and that appellants would furnish sufficient cash to buy out any remaining certificate holders who might not desire to continue operation, in which event the purchase price of the holdings was to be fixed by agreement with the committee or otherwise. But the committee at no time has filed any plan with the depositary or submitted the proposed sale of the properties, to the Chesapeake Steamship Company and the Wilson Line, Inc., to the holders of the certificates of deposit for approval, and, after having become acquainted with the attitude of the

bondholders owning two-thirds of the $90,000 unpaid bond issue, filed a petition in the foreclosure suit, reciting many of the facts previously mentioned, including the tentative sale to Chesapeake Steamship Company and Wilson Line, Inc., and the terms thereof, and therein prayed: (a) That they might be permitted to intervene as parties in said cause; (b) that the court authorize and direct them to enter into such further contracts with respect to sale of the properties to said parties and receive the balances of the purchase price therefor and deliver such papers and receipts as might be necessary and hold the funds arising therefrom in their hands subject to the further order of the court; (c) that the court take jurisdiction in the premises and ratify and confirm the acts of the committee with respect to the sale therein reported, supervise and direct them in the further performance of their duties and obligations and in the exercise of their powers under the said deposit agreement; (d) that the court direct the trustee under the mortgage to make conveyance of the wharf property to the Chesapeake Steamship Company, and of the resort property and boats to the Wilson Line, Inc., on payment to the petitioners of the balance due therefor in accordance with their contract of sale; (e) that the court direct and supervise the committee in the "application, disposition and distribution of the proceeds of sales, whether in cash or securities, to the persons properly entitled thereto"; and (f) for further relief. Jurisdiction was assumed by the court, and the petitioners were granted leave to intervene. An order was passed requiring the receiver to show cause why the relief prayed in the petition should not be granted, and shortly thereafter present appellants were allowed to intervene by alleging their ownership of sixty-six per cent. of the outstanding certificates and their interest in the assets of the Tolchester Beach Improvement Company of Kent County. They subsequently filed an answer to the committee's petition, attacking the sale to Wilson Line, Inc., as being improper, in that the security offered was weak and inadequate, the

sale not having been made for cash; asserted that all of them except one owned stock of Tolchester Beach Improvement Company and purchased their certificates of deposit in good faith, believing the property could be profitably operated as a whole, and on November 25th, they advised the committee as to the extent of their holdings, informed them they did not wish the property sold by the committee, but desired that the latter take title thereto in the name of a corporation and distribute the securities to holders of certificates of deposit in accordance with their holdings as contemplated by the depository agreement. It was further alleged that the petition of the protective committee was filed without notice to present appellants, notwithstanding the committee had been previously notified of their desires with reference to holding the property; that they were opposed to such sale and had learned of it only through outside sources. They prayed: (a) That the committee be directed to desist from any further efforts to sell the property to the Chesapeake Steamship Company and the Wilson Line, Inc.; and (b) that it be required to take title in the name of a corporation to be formed by the committee, and in turn to be substituted for the committee as purchaser, and that the securities of the corporation be prorated among the certificate holders, subject to such provisions as the court might think proper to secure unto certificate holders, other than these appellants, who desired not to continue their interest in the property, an alternative cash equivalent to what they would receive if the property were sold as proposed in the petition. Upon issues made by the petition and answer, testimony was taken before the chancellor, who later rendered an oral opinion and filed a decree ratifying the sales as reported by the committee. It is from this decree that the present appeal is taken.

The chief argument urged in this court for a reversal of the decree appealed from rests upon the contention that the protective committee, who bought the property at the mortgage foreclosure sale for the bondholders, had,

under the depository agreements issued with the certificates of deposit to the bondholders when they surrendered their bonds to the depositary, no authority, express or implied, to make the sales. While appellees contend (a) that the rights and powers of the committee are to be determined not alone by the construction of the deposit agreement, but as well by consideration of certain provisions of the indenture, in connection with all the surrounding facts and circumstances attending the transaction; that when viewed in this light the decree appealed from is proper, since the evidence shows the committee acted in good faith and exercised its best judgment on behalf of the bondholders; (b) that, independently of the aforegoing contention, appellants are estopped to question the decision of the committee and have no standing in a court of equity, since they themselves are mere speculators, whose actions are not for the best interests of the other certificate holders, the interests of whom the committee is bound to protect.

The decision of the chancellor to ratify the sale seems to have been based upon a finding that the committee had reached its decision to sell because it felt that a plan of reorganization was not feasible and that any proposition that the property be thrown back to the bondholders, only sixty per cent. of whom favored operation, was unsound, and that since those holding the certificates of deposit had accepted the judgment and discretion of the committee, sixty per cent. of such certificate holders could not dictate its policies. He further found it quite as reasonable to infer that the committee had authority to dispose of the property as that it originally had power to purchase it for the bondholders. But paragraph 9 of the depository agreement contains this language: "It is expressly agreed that in the event of there being a sale of all or any of the property of the Corporation by reason of the foreclosure of the mortgage securing said bonds or for any other cause, irrespective of whether any plan or agreement has been adopted or approved, the Committee shall have power to purchase the same (through

the medium of a corporation if necessary and with or without notice to the Depositors) by using the deposited bonds, to bid in such property, and, in such event, any depositor who may subsequently have any right of withdrawal as hereinbefore provided may, if the Committee in its discretion so determines, be entitled to receive in lieu of a pro-rata share of the property so purchased (or its equivalent in stock of any corporate purchaser or holder), a sum in cash equal to the amount of the purchase price credited against the bonds represented by his certificate of deposit, in the distribution of the proceeds of such sale."

In view of this provision it would seem that specific authority was vested in the committee to purchase the property without regard to whether any plan had been adopted and, therefore, prior to ascertaining whether a reorganization was feasible or a liquidation necessary, and it does not follow that, because the committee felt reorganization was not feasible, that this could supply any lack of authority which it had to dispose of the property. It is to be noted that, notwithstanding the anxiety expressed by appellees for the owners of certificates of deposit, not appellants herein, none of these have intervened in this proceeding, nor have any of them shown the slightest interest in sustaining the decree or indicated that they felt a reversal would injure them.

It is suggested that article 5 of the depository agreement implies a power to sell or otherwise dispose of the property without the consent of the bondholders. Its pertinent sections are as follows: "Without in any way limiting the power of the Committee as the legal and equitable owner of the deposited bonds * * * the Depositors authorize * * * the Committee * * * as owners of said bonds * * * (9) to exercise each and every other right and power conferred upon the holders of said bonds by the terms of said mortgage or by law or equity."

Undoubtedly this language literally makes this committee the owners of the bonds, but it cannot be contended that they own any beneficial interest therein, since it is

clear, from the purpose of the agreement and the language used in article 3 thereof, that "deposited bonds shall be subject to the powers hereby conferred upon Committee and subject to the provisions of this instrument," that when the committee vests in itself legal title to the bonds, it is "as trustee in trust for the purposes hereof * * * ." And any doubt that it was the purpose to place definite limitations upon the committee by confining its powers to the purpose of the agreement vanishes by consideration of section 15 of the same article, which gives the committee power, "generally, to take * * * and to do * * * all things which the Committee * * * may deem necessary or expedient for the foregoing purposes or for the protection of the interests of the Depositors or for the purpose of carrying out this agreement, even though such things be apparently of a character not now contemplated."

Moreover section 14 of article 5, permitting a sale of the bonds at not less than their face value and interest, is another limitation showing an intent on the part of the bondholders not to permit final disposition of their property for less than the par value of the bonds and interest in cash, and is therefore entirely repugnant to the implication of power in the committee to dispose of the property as is here proposed.

Article 16 contains this language: "The Committee is hereby authorized and empowered to construe this Agreement and its construction of the same made in good faith shall be final, conclusive and binding." And it is urged that this is sufficient to imply in the committee power to dispose of the property of the bondholders without their consent, but this must be read in connection with the entire agreement, and when so considered we are of the opinion that it is insufficient to authorize the implication of such an extraordinary power. As was said in *Industrial & General Trust, Ltd., v. Tod,* 180 N. Y. 215, 225, 73 N. E. 7, 9:

"As the reorganization agreement was prepared by the committee, and the language used is wholly their own, it

should be construed most favorably to the bondholders, who had no part in preparing it, but were compelled to accept it as it was, or not accept it at all. \* \* \*

"If one party \* \* \* has the unrestrained power to say what it means, the other has no rights except by sufferance. The parties to the contract before us were not in that situation, and human language is not strong enough to place them in that situation. The defendants, with all their power, could not make a new contract, or subvert the agreement by construing a vital provision into or out of it."

We also quote from *Cox v. Stokes,* 156 N. Y. 491, 508, 51 N. E. 316, 321: "If they had power to modify or dispense with this stipulation, they had power to disregard the agreement in every particular, and to enter into a new and wholly inconsistent contract without the consent of the bondholders for whom they were acting. They could thus set aside and subvert the very instrument which was the source of all their power. It is idle to claim that they could change or dispense with an express stipulation of the agreement, or that in doing so they acted in good faith. Even if they acted in good faith as matter of fact, they are presumed to have acted in bad faith as matter of law. \* \* \* If, by their own action, they could enlarge their powers in one respect, they could do so in all respects. Their action was beyond their authority, and void. They could not add to their authority by changing the agreement, which was the source and limit of their power, any more than one can add to his stature by taking thought."

See, also, *Carter v. First Nat. Bank of Pocahontas,* 128 Md. 581, 590, 591, 98 A. 77.

We feel that the implication of a power, from the general language used in the agreement, to sell the property contrary to the wishes of the bondholders, with no limitation on price or terms, would violate the general import of the agreement, as well as the spirit of its express provisions contained in articles 5 (14), and 9, that such holding would ignore the context of the lan-

guage used by the parties, for the committee's actual authority is not to be enlarged by its own construction.

And finally we may add that, in our judgment, powers which are plainly not contemplated by the agreement to exist in the committee do not arise because of the fact that many of appellants bought their certificates of deposit subsequent to the date on which the committee contracted to resell the properties. As appellants were stockholders in the Tolchester Beach Improvement Company, it was but natural for them to protect their interests by purchasing these certificates, and the rights of all certificate holders are to be ascertained by the nature of the agreements signed by the bondholders and not by the personnel of the present holders or the date upon which they acquired the holdings, nor by their motives in their acquisition. *Texas Hotel Securities Corporation v. Waco Development Company* (C. C. A.) 87 Fed. (2nd) 395.

It may be added that section 9 of the depository agreement incorporates by reference the terms of the mortgage, and that the latter contains a provision in article 6 (section 11) that bondholders may purchase the property on foreclosure and, after purchasing, "may hold, retain possession and dispose of such property in their own absolute right without further accountability." This reference, however, has no applicability to the situation under consideration, for here we are dealing not with the action of the bondholders in disposing of their property, but with their protective committee, whose act in reselling it was not authorized by the bondholders and has not since been ratified by them.

> *Decree reversed, and cause remanded for further proceedings not inconsistent with this opinion, with costs to appellants.*