## CENTRAL SAVINGS BANK OF BALTIMORE ET AL. *v.* POST ET AL.

[No. 85, October Term, 1948.]

372

*Decided February 16, 1949.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*A. Adgate Duer* and *Carlyle Barton,* with whom were *Niles, Barton, Morrow & Yost* on the brief, for the appellants.

*G. VanVelsor Wolf* and *L. Vernon Miller,* with whom were *John W. T. Webb* and *Marbury, Miller & Evans* on the brief, for the appellees, The Savings Bank of Baltimore et al.

Submitted on brief by *Venable, Baetjer & Howard* and *Edmund P. Dandridge, Jr.,* for the appellees, A. H. S. Post et al., Committee.

MARKELL, J., delivered the opinion of the Court.

On December 23, 1930, receivers for the Seaboard Air Line Railway Company were appointed by the United States district court for Eastern Virginia, in equity, and in ancillary proceedings in Southern Florida. On July 31, 1946, after sale under foreclosure of bond mortgages pursuant to a plan of reorganization, the properties of the Seaboard system were transferred to the new corporation formed under the plan.

As of August 1, 1931, an Underlying Bondholders' Protective Agreement was entered into between an Underlying Bondholders' Protective Committee and such holders of Underlying Bonds as might become parties to the agreement by depositing their bonds with a Depositary under the terms of the agreement, and the holders of certificates of deposit issued under the agreement. Upon every deposit certificates of deposit were to be issued, identifying the issue of which the deposited bond was a part. Upon transfer of a certificate the transferee was for all purposes to be substituted, as a Depositor, for the prior holder. The Underlying Bonds comprised eleven issues, secured by mortgages on particular parts of the Seaboard system, of ten corporations to which Seaboard was the successor by consolidation and one sub-

sidiary corporation whose property was by lease a part of the system.

The lengthy deposit agreement, in conventional form, contains particular recitals and provisions relating to the Seaboard situation and general provisions many of which had become standardized fifty years ago. *Cf. Industrial and General Trust Ltd. v. Tod,* 180 N. Y. 215, 73 N. E. 7. Each Depositor by the deposit of bonds assigns them to the Committee "in trust for the uses and purposes and with the powers" set forth in the agreement. The Committee is vested, "as trustee of an express trust," with the full legal title to the bonds deposited. *Cf. Bullard v. City of Cisco,* 290 U. S. 179, 189, 54 S. Ct. 177, 78 L. Ed. 254. The deposited bonds and all assets from time to time in the hands of the Committee are "charged with the payment of the indebtedness, obligations and liabilities of the Committee and its compensation and expenses". The Committee is authorized and empowered, whenever in its judgment it shall become advisable so to do, to prepare and adopt a plan for reorganization.

Any Depositor (*a*) within thirty days of notice of adoption or approval of a plan of reorganization [Article Sixth] or (*b*) if no plan shall have been adopted or approved within five years of the date of the agreement [Sixth] or (*c*) within specified periods of notice of an amendment of the agreement [Eleventh] or (*d*) a modification of a plan [Eleventh] or (*e*) if a majority in interest of Depositors of bonds of any underlying issue shall determine that a conflict exists between their interests and the interest of Depositors of any other issue [Sixteenth, 4] or (*f*) "if in the uncontrolled judgment of the Committee" such a conflict of interest or any other reason makes it expedient for the Committee to cease to represent the Depositors of any issue [Sixteenth, 5], may upon the terms and conditions set forth in Article Tenth withdraw from the agreement and "thereupon shall be entitled to receive securities or property as provided in Article Tenth and shall cease to have any rights hereunder."

Article Tenth provides: "Whenever by any provision of this Agreement a right of withdrawal is conferred upon the holder of any certificate of deposit for Underlying Bonds, any such certificate holder desiring to exercise such right shall, at the time of and as a condition precedent to such exercise," surrender his certificate and pay "(a) * * *, (b) a fair contribution, as determined by the Committee, toward the compensation and the expenses of the Committee incurred to the date of such surrender, the amount to be paid under this subdivision (b) not, however, to exceed a sum equal to one and one-half per cent. (1½%) of the face amount of the bonds represented by the certificate of deposit surrendered, and (c) at the election of the Committee, such sum as the Committee in its sole discretion shall fix as his ratable proportion of all other indebtedness, obligations and liabilities of the Committee incurred to the date of such surrender;" and thereupon shall be entitled to the delivery of Underlying Bonds, of the issue and to the amount called for by his certificate, stamped with the payment of any amount that shall have been paid or credited thereon, or at the election of the Committee to receive his ratable share of the proceeds of or substitutes for such Underlying Bonds then under the control of the Committee, and of other securities, stocks or property, if any. "Depositors by such withdrawal shall thereupon and without any further act be released from this Agreement and cease to have any rights under this Agreement or under any plan or agreement adopted or approved pursuant to this Agreement; * * *".

The only plan of reorganization ever formally adopted or approved by the Committee was the plan which had been approved by the receivership courts and was eventually carried out. By a letter to certificate holders dated October 31, 1944, and an advertisement published on November 1, 1944, the Committee gave notice of adoption and approval of the plan and the right of Depositors to withdraw from the agreement on or before December 2, 1944. The withdrawal fees fixed by the Committee

and in effect from time to time ranged from $15 per $1000 bond from November 25, 1936 to February 5, 1940 to' $18.25 from August 1, 1943 to December 2, 1944—and thereafter. Out of $23,672,000 of bonds of all issues deposited from time to time, $5,268,000 were withdrawn. The only bonds withdrawn after December 2, 1944 were all the $1,880,000 of then deposited bonds of two issues (Raleigh & Augusta and Raleigh & Gaston) which were not affected by the reorganization plan but were paid in full by the receivers out of earnings (principally war earnings) from those portions of the Seaboard system. Most of the certificates for bonds of these two issues had previously been bought by the receivers, who withdrew the bonds and paid the withdrawal fee in 1946, before consummation of the reorganization, in order to procure release of the mortgages. The withdrawal fees collected by the Committee aggregated $96,955. When the plan was consummated in August, 1946 the Committee made a deduction, to reimburse itself for its expenses and compensation, from the cash payable under the plan on the bonds still held by it, of $15 per $1000 bond-less amounts previously withheld from interest payments on the bonds of four issues, including the two Raleigh issues. The aggregate amount collected, by withholding, from non-withdrawing certificate holders was $276,060.

In the fifteen years of its activities the Committee incurred large expenses, part of which were currently paid out of loans obtained on the security of the deposited bonds and part were not paid, or the amount judicially fixed or approved, until after consummation of the reorganization. The Committee's services and expenses, (a) in formulating and carrying out, together with other committees, the plan of reorganization, enured to the benefit of all interests in the reorganization, and (b) in protecting the position of Underlying Bonds as against other interests, e. g., in successfully opposing issuance of receivers' certificates prior in lien to the Underlying Bonds and in negotiating for the best possible position of the Underlying Bonds in the plan of reorganization,

enured to the benefit of its Depositors only. For expenses of the former kind, as receivership or reorganization expenses, the Committee was entitled to reimbusement from the receivers or out of a $10,000,000 expense fund under the reorganization plan, either under long established equitable principles (*Trustees v. Greenough,* 105 U. S. 527, 531-537, 26 L. Ed. 1157; *Cowdrey v. Galveston, etc., R. Co.,* 93 U. S. 352, 354, 355, 23 L. Ed. 950), or under section 77 of the Bankruptcy Act, if applicable. 11 U. S. C. A. § 205, Act of March 3, 1933, c. 204, 47 Stat. 1474, sec. 77, sub. (c) (8), Act of August 27, 1935, c. 774, 49 Stat. 911, sec. 77, sub. (c) (12). For expenses of the latter kind the Committee was entitled to reimbursement, not from the receivers or out of the reorganization fund, but only from its Depositors. The Committee invoked the jurisdiction of the receivership courts under section 77, sub. p, of the Bankruptcy Act, 11 U. S. C. A. § 205, sub. p, Act of August 27, 1935, c. 774, 49 Stat. 911, sec. 77, sub. p, last paragraph, to determine reasonable amounts to be paid by the Committee and charged to its Depositors. Apparently it was held by the receivership courts, by ratifying a special master's report, that compensation of the Committee could not be reimbursed as a receivership or reorganization expense, either under the statute or under equitable principles applicable before the statute.

Before consummation of the reorganization, the Committee did not pay any fee to its counsel (except $20,000 in 1932) or any compensation to its members, but application was made for allowance, as reorganization expenses, of a counsel fee of $300,000 (including $20,000 already paid) and compensation of $30,000 to the Committee. The courts, in ratifying the special master's report on November 16, 1946, allowed $125,000 as a counsel fee (including reimbursement to the Committee of $20,000 paid in 1932) out of the receivership estate, and held that $100,000 would be a reasonable additional fee, and $30,000 reasonable compensation to the Committee, to be charged to the Depositors.

The Committee's expenses and compensation amounted to $593,241, comprising counsel fee, $225,000; compensation, $30,000; secretary and depositaries, about $116,000 (including $12,121 paid by Depositors directly to Depositaries for issuing certificates), compensation and expenses of experts (accountants and engineers), $104,000; interest on loans, $81,000; printing, advertising, traveling, mail, telephone, etc., $34,000. Under orders of the receivership courts, in June, 1944 $195,562 (a tentative allowance before adoption of the reorganization plan), in November, 1946, $125,000 (for counsel fee), and in July, 1947, $115,861, a total of $436,424, was received by the Committee as reimbursement from the receivership estate. The Committee's receipts were $821,948, including withdrawal fees, $96,955; charge for issuing certificates, $12,121; assessment of non-withdrawing certificate holders, $276,060; reimbursements from the receivers, $436,424. After payment of expenses the Committee has on hand a balance of $228,706. Until receipt of the $195,562 from the receivers in June, 1944 the Committee was unable to pay off the loans obtained by it to pay out-of-pocket expenses. Without the assessment of $276,060 from non-withdrawing certificate holders in August, 1946, or the last reimbursement of $115,861 from the receivers in July, 1947, the balance of $228,706 would be a deficit of $163,215.

The Committee filed a bill in the lower court, alleging that it has this balance of $228,706 on hand "for distribution to those bondholders entitled thereto under the terms of the Deposit Agreement", and that conflicting rights to share in the distribution "have been asserted on behalf of withdrawing and non-withdrawing depositors," this conflict arising "from opposing interpretations of the Deposit Agreement, the basic question being whether or not under the terms thereof distribution should be made to all depositors, (in which event each depositor of both classes would receive a refund of approximately $9.00 for each $15.00 withheld or paid as a withdrawal fee) or *only* to those who remained as depositors until" con-

summation of the plan of reorganization, "(in which event non-withdrawers would receive a refund of approximately $12.00 of each $15.00 withheld)," and praying that the court "assume jurisdiction of the further administration" of the Committee's trust, and that a decree be passed construing the deposit agreement and directing the Committee in the complete distribution of the trust property. The bill names 68 defendants as representative of the two classes of all depositors, who are too numerous (more than 1500 in number) to be made parties. *Cf. Diggs v. Fidelity & Deposit Co.*, 112 Md. 50, 63, 64, 68, 82, 75 A. 517, 20 Ann. Cas. 1274; *Orrick v. Fidelity & Deposit Company*, 113 Md. 239, 246, 247, 77 A. 599; *Leviness v. Consolidated Gas Electric Light & Power Co.*, 114 Md. 559, 564-570, 80 A. 304, Ann. Cas. 1913C, 649. After hearing on bill, answers and testimony, a decree was entered, assuming jurisdiction and directing (*a*) allocation of the remainder of the funds (after payment of expenses, including costs and such counsel fees as may be allowed in this proceeding) among those bonds which were not withdrawn but were exchangeable for new securities under the plan of reorganization, and (*b*) distribution to be made accordingly. From this decree depositors who had withdrawn their bonds appeal.

Appellants contend that: The deposit agreement is silent as to the distribution of such a fund as this $228,706. Had the draftsman contemplated the possibility of the Committee having a fund of this type after the consummation of the receivership, provision would have been made to cover the distribution of the fund. There is no provision in the agreement which can be interpreted to cover the contingency that has arisen. The decision should be based, not upon an attempt to interpret the agreement, which is not susceptible of interpretation on the point in question, but solely upon a consideration of the comparative equities of the withdrawing and non-withdrawing bondholders. It is inequitable that the withdrawing bondholders should bear

a disproportionate share of the expenses of the Committee. Withdrawing bondholders did not agree to allow non-withdrawing bondholders to be unjustly enriched at their expense.

These contentions, we think, are not in accord with the terms of the agreement or with equitable principles. Equity, like the common law, is not "a brooding omnipresence in the sky." Equitable principles are applicable to limited subjects in limited circumstances, *e. g.*, fraud, mistake, trusts, fiduciary relations. They may affect the construction or performance of contracts, but ordinarily they do not ignore or override the terms of lawful contracts. The duties and obligations of the members of a bondholders' committee "are in the highest degree of a fiduciary nature, * * * . Such a committee is of necessity to be held to the most strict accountability, and in construing the terms of such an agreement the construction to be placed upon it is that most favorable to the bondholders." *Carter v. First National Bank of Pocahontas*, 128 Md. 581, 590, 591, 98 A. 77; *Industrial and General Trust, Ltd. v. Tod, supra; Rodgers, Rights and Duties of the Committee in Bondholders' Reorganizations*, 42 Harvard Law Rev. 899, 929. The committee's powers to construe such an agreement is strictly construed. *Lewis v. Fisher*, 172 Md. 201, 210, 211, 191 A. 250, quoting *Industrial and General Trust, Ltd. v. Tod, supra;* and *Cox v. Stokes*, 156 N. Y. 491, 51 N. E. 316. In the instant case no fraud, mistake, breach of trust or abuse of fiduciary relations is charged. The Committee is not attempting to construe the agreement, but asks the court to do so.

The terms of the agreement are sufficient to cover the distribution of this fund. Not only Article Tenth, relating to all withdrawals, but each of the six provisions in Articles Sixth, Eleventh and Sixteenth relating to each right of withdrawal, expressly provides that Depositors by withdrawal shall "cease to have any rights" under the agreement. The scope of these general words cannot be narrowed by reading in—or out—an exception of rights in a contingency not contemplated. Deposit

agreements, like plans of reorganization, *Reconstruction Finance Corporation v. Denver & Rio Grande Western Railway Co.,* 328 U. S. 495, 66 S. Ct. 1282, 90 L. Ed. 1400, look beyond forseeable contingencies and contemplate, in general provisions broad enough to cover, not only probable but possible contingencies, *e. g.,* the War itself, which through war earnings materially facilitated practically all recent railroad reorganizations. Parties to such agreements must expect the unexpected.

Appellants "emphasize that there is no dispute between the parties to the agreement with regard to the withdrawal fees." No one has ever questioned the reasonableness of them. At the argument appellants conceded that, if the surplus of $228,706 had been a deficit, in no event could the bondholders who had withdrawn have been required to make any additional payment. "The contract resulting from the deposit of securities under a deposit agreement is rather a peculiar one. It imposes no affirmative liability on the depositor. He ceases to be a party to the agreement the moment he transfers his certificate to another. It is practically an agreement *in rem* which follows the certificate into the hands of any holder." *Paul D. Cravath, Some Legal Phases of Corporate Financing, Reorganization and Regulation—Reorganization of Corporations,* (1917) pp. 153, 164. In the opinion of the lower court Judge Smith says: "Now it is more realistic to speak about the bonds that were deposited as being affected by the agreements than it is to speak about bondholders being parties to the agreement. The agreement allowed the Committee to look entirely to the bonds and no further, and the only things out of which the Committee could hope to get any sustenance of any kind was out of the bond, so the only realistic way to look at it is to think about the bonds themselves as so much property being deposited with the Committee and the Committee having certain authority over it." In the circumstances a surplus after payment of expenses can hardly be unexpected. At the consummation of the reorganization in August, 1946, the Committee could not foretell the amount of

either its receipts or its expenses, *e. g.*, its counsel fee; counsel received $75,000 less than was asked, the receivers paid $175,000 less, and the Depositors $100,000 more. As the Committee could not be expected to risk non-payment of its expenses or to assume personal responsibility for them, it was necessary, in order to provide for all possible contingencies, to collect from the Depositors an amount that would be practically certain to yield a surplus. Fixing withdrawal fees is still more difficult on account of the uncertainty whether (and if so, when) any reorganization at all will be effected. If in fixing such fees no allowance should be made for future expenses, which may seem necessary to salvage the fruits of past expenses but may prove fruitless, it would seem that likewise no allowance should be made for future reimbursement from the receivership estate, which would be contingent upon a successful reorganization or other result beneficial to all interests and would be limited by the extent of such common benefit. As the reasonableness of the withdrawal fees is not a question in the instant case, we express no opinion as to how they should be fixed. As withdrawing Depositors take no risk of expense after withdrawal, it is not inequitable that they have no chance of gain. This is the plain meaning of the agreement.

In *Badenhausen v. Baetjer*, 4 Cir., 146 F. 2d 762, 764, 765, a rival Georgia and Alabama committee and one Martin, a purchaser of certificates of deposit, sought to compel the Committee to cease representing bond of that issue and to permit withdrawal of the bonds (without payment of withdrawal fee) because of alleged conflict in interests between that issue and other issues of Underlying Bonds. In denying the relief prayed the court, in its opinion by Judge Soper, said: "There is another reason why the petition of the Badenhausen Committee and of Martin should be denied. * * * This charge [the withdrawal fee] is a lien upon the bonds deposited with the Committee and reduces their market price. The price at which Martin acquired the certificates of deposit now

held by him must have been affected by this circumstance, and if he is now permitted to withdraw the bonds and relieve them of the liability for past expenses, he will be unjustly enriched." In the instant case there is evidence that many withdrawals were made in order to realize by sale a profit through the difference (greater than the withdrawal fee) between the market prices of "free bonds" and certificates of deposit.

Appellants ask us to regard letters, dated June 30, 1942, from the Committee to holders of certificates of deposit for four issues of Underlying Bonds as a practical (though admittedly not a formal or in terms generalized) construction of the agreement, as authorizing distribution on bonds after withdrawal. The Committee had then obtained from the receivers payment on account of unpaid interest on four issues of Underlying Bonds, viz., $250 per $1000 bond on each of the two Raleigh issues, $25 on the Florida Central and $20 on the Carolina Central. In the letters dated June 30, 1942 to the holders of certificates for these issues, the Committee stated that in remitting to depositors of these issues the interest payments, "the Committee has deducted in part payment of the share of Committee loans and unpaid expenses now chargeable against each such bond, the sum of [$15, $12.50 or $10, as the case may be] per $1000 bond," and then said: "The Committee is hopeful that at a later date it will receive from Seaboard Air Line Railway Company or a reorganized company, reimbursement of its expenses. Any such reimbursement received by the Committee, will be paid or applied prorata on account of the Certificates of Deposit which bore the expenses, as follows: (a) In the case of Certificates of Deposit outstanding at the time of such payment, to the registered holders thereof on such date; (b) In the case of Certificates of Deposit cancelled through intervening withdrawals, to the persons in whose names such Certificates of Deposit were registered at the respective dates of withdrawal; all in such manner, at such time, and in accordance with such regulations as the Committee may deem proper." Instead of following this procedure, the Committee, when

bonds of any of these four issues were withdrawn, credited the 1944 deductions against the withdrawal fee, thus in effect refunding these deductions to withdrawing depositors before they were refunded to non-withdrawing depositors after August 1, 1946. These letters virtually set apart the amount of these deductions as inchoate payments to depositors. The fact that these deductions were actually so refunded, and the inchoate payments thus consummated, perhaps might have entitled non-withdrawing depositors to demand similar refunds to them. If either the letters or the practice actually followed involved any misconstruction of the agreement, such a misconstruction does not entitle appellants (depositors who withdrew at any time, whether before or after June 30, 1942 or December 2, 1944) to the misconstruction they now ask. The Committee in its letter of October 31, 1944 to all certificate holders, giving notice of adoption and approval of the plan of reorganization, clearly indicated that the alleged misconstruction would not be repeated. In the letter of October 31, 1944, the Committee, referring to its unpaid expenses and compensation, said: "the burden of said expenses and any additional expenses and compensation that may later be allowed could be assessed against depositors in an amount not in excess of the withdrawal fee then applicable. The Committee, however, does not anticipate that any such assessment will become necessary and intends to apply to the Court for payment from the receivership estate for reimbursement for additional expenses and for allowances. The Committee does not expect to ask the Court to make any provision for a refund to depositors who have withdrawn their bonds." In the letter of August 1, 1946, to certificate holders, giving notice of consummation of the reorganization, the Committee also avoided any misconstruction in the letters of June 30, 1942 and followed the procedure stated in the letter of October 31, 1944, and also showed that it had been disappointed in "not anticipating that any assessment would become necessary". In the letter of August 1, 1946 the Committee said: "Pursuant to the terms of the Deposit Agreement,

which permits the Committee to make a deduction to reimburse itself for its expenses and compensation, the Committee had directed its Depositaries to withhold $15.00 from the proceeds of each $1,000 bond of all issues except Florida, Central and Peninsular Railway Company and Carolina Central Railroad Company as to which the present withholding will be respectively $2.50 and $5.00 per each $1,000 bond because of a previous withholding from an interest payment of $12.50 and $10.00 respectively. The Receivership Court has reimbursed the Committee for a portion of its expenses and the Committee has made application to the Court for the payment of all unpaid expenses and compensation for services of the Committee, its Secretary and its Counsel. It is, however, possible that the Court may hold that some of these charges must be paid by the bondholders and not by the Receivership Estate for the reason, among others, that they were incurred primarily for the benefit of depositing bondholders rather than for the benefit of the Receivership Estate as a whole. The amount of cash withheld is to cover this contingency and when the matter has been decided by the Courts and the amounts of expenses and compensation determined, the person in whose name the new securities are first registered will be entitled to receive a refund, if any balance remains in the Committee's hands, after the payment of all of said expenses and compensation."

The deposit agreement provides for alternative performance, at the option of each depositor, viz., (*a*) by exchange for securities (or cash or both) at the consummation (or abandonment) of a reorganization or (*b*) by withdrawal before reorganization. Appellants chose the latter alternative. Upon withdrawal they "ceased to have any rights under the agreement." The fund now on hand is distributable among the "Depositors," *i. e.*, those who did not withdraw. This is in effect stated in the letter of August 1, 1946.

*Decree affirmed, costs above and below to be paid out of the fund.*