## BALTIMORE PAINT AND CHEMICAL CORPORATION *v.* BLOOM

[No. 126, September Term, 1970.]

*Decided December 10, 1970.*

52

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SINGLEY and SMITH, JJ.

*Charles Yumkas,* with whom were *Jacob Blum* and *Blum, Yumkas & Mailman* on the brief, for appellant.

*Francis D. Murnaghan, Jr.,* with whom was *Stuart H. Rome* on the brief, for appellee.

HAMMOND, C. J., delivered the opinion of the Court.

The appellee, Bloom, sued the appellant, Baltimore Paint and Chemical Corporation, to require it specifically to perform a concededly valid individual employment and retirement contract by paying him in his retirement the monthly sums it had promised in the contract to pay him in such case. The company's defense was that it had discharged its obligation to Bloom when it later included him in a general pension plan funded by an insurance company and agreed to pay him monthly the difference between what his individual contract called for and the lesser amount the insurance company would pay him.

Judge Perrott, sitting in the Circuit Court of Baltimore City, received extensive evidence, oral and written, and then ruled that the paint company must pay the monthly benefits under the individual contract without credit or reduction of any nature by reason of benefits received or to be received by Bloom from the insurance company. Judge Perrott's reasoning was that, although the paint company did not intend Bloom to enjoy two pensions, this does not relieve it of the two separate unam-

biguous written sets of obligations to Bloom which it bindingly incurred, even though it included him in the general pension plan in the unfounded hope—or perhaps more accurately the erroneous expectation—that he would exchange his rights under his individual contract for those under the general pension plan. Judge Perrott made detailed findings of fact which the evidence fully justified and the conclusions he reached flow appropriately and properly from those findings. We adopt his opinion as the opinion of this Court and direct the reporter to print it in the report of this case.

*Decree affirmed, with costs.*

## MEMORANDUM OPINION
## OF JUDGE JAMES A. PERROTT

Samuel A. Bloom (hereinafter called "Bloom") entered the employment of Baltimore Paint and Color Works (hereinafter called "Company"), as its Technical Director, in November of 1948 and there was no written employment contract between the parties. At that time Company was closely held by the Shuger family. In October of 1958, however, Company was sold by the Shugers to the American Dryer Corporation; William Kane became President; Albert A. Shuger was designated Chairman of the Board and Chief Executive Officer, and other members of the Shuger family remained in various other managerial positions.

On September 1, 1959, an agreement was executed between Bloom and Company. The agreement was titled, "Retirement Plan Contract," and was executed on behalf of Company by Albert A. Shuger. He had been authorized to act by the Company's Board of Directors, and his authority extended to the execution of similar agreements with other employees.

"Retirement Plan Contract" is an employment contract which provided a pension. Under this contract, Bloom obligated himself to continue in the fulltime employment of

Company until his sixty-fifth birthday, June 22, 1969; employment beyond that date was to be by mutual agreement only. Company agreed to pay Bloom (a) annual compensation, during his continued active employment, in an amount not less than his compensation, including bonuses, for the calendar year 1959 and (b) a lifetime pension, beginning with his retirement, in an amount equal to 50% of the greater of (i) his average annual compensation for his four highest paid years with Company and (ii) his compensation for the calendar year 1959. The pension was to begin earlier, if Bloom either became totally and permanently disabled or was discharged for any reason other than intentional failure to perform his duties or gross misappropriation of company funds. This early pension would be calculated in the same manner as the normal retirement pension, with one exception; in the case of a wrongful discharge, the pension would be subject to an offset of any annual employment earnings received by Bloom elsewhere, but only to the extent that the aggregate of those earnings and his pension (normally computed) might exceed his compensation for his highest paid year with Baltimore Paint. In addition to the benefits for disability or wrongful discharge, the agreement also gave to Bloom an option to elect a reduced normal retirement pension which would continue after his death for the benefit of his surviving spouse.

Disability benefits would terminate upon Bloom's death. The normal retirement benefits would terminate upon his death or the death of his wife, if he had elected the survivor option, or upon his engaging in any way in any business directly or indirectly competing with Company.

At the time Bloom entered into his contract, Company had in effect a qualified group pension plan which provided some limited benefits but covered only lower echelon employees. Bloom was not covered by this plan. Prior to September 1, 1959, and for a period of time thereafter, Company considered a new group pension plan which would cover all employees, and individual contract hold-

ers would be entitled to the benefits of both the group pension plan and the benefits provided by their individual agreements.

At least eleven individual contracts were executed. One of these was with Alex Vida. (Mr. Vida's contract dated December 2, 1956, provided for a normal retirement pension of 40% of his salary and did not contain any express provision for any offset of any kind against this amount (Plaintiff's Exhibit No. 22). As the company acknowledged on several occasions following December 22, 1959, Mr. Vida was covered by the existing group pension plan, (Plaintiff's Exhibit No. 23). Mr. Vida has subsequently terminated his employment with Company.

In 1961 control of Company passed from American Dryer to a triumvirate headed by one Edward Krock, a Worcester, Massachusetts businessman, who assumed Albert A. Shuger's positions as Chairman of the Board and Chief Executive Officer.

Mr. Shuger was replaced as President in 1963 by Eugene L. O'Brien, who has since served as President of Company to date. Mr. O'Brien learned of the limited group pension plan and of the existence of individual deferred compensation agreements with eleven employees, seven of whom (including Bloom) were still with Company. Although Mr. O'Brien knew nothing of the circumstances under which the individual contracts had been negotiated, he immediately concluded that they were unfair and discriminatory, and that the existing group plan was inadequate.

Company's lawyers reviewed the seven surviving contracts and advised Company that they represented valid and binding obligations. Company's independent accountants reviewed them and concluded that Company had to set up a reserve with which to pre-fund the obligations which they represented. The accountants calculated that Company's ultimate liability on the contracts was $761,-321.00. They determined that this amount (including $194,147.00 allocable to the period prior to 1963) should be funded in the accounts over a ten year period, begin-

ning with 1963, at an annual rate of $79,300.00 (or, $19,-300.00 for the liability allocable to the period prior to 1963 and $60,000.00 for the liability allocable to 1963 and thereafter.

Mr. O'Brien then approached a close friend with Massachusetts Mutual Life Insurance Company, who arranged for a preliminary study by another expert, William L. Gardner. Mr. Gardner's report, dated November 15, 1965, was delivered to Company and reviewed by Mr. O'Brien, Sewell J. Shuger and a Vice President and Treasurer of Company, C. W. Mann, Jr. In his report, Mr. Gardner estimated that the ultimate value of the future benefits called for by the seven individual deferred compensation agreements was approximately $650,000.00; this figure was arrived at by simply calculating the cost of Company of separate annuity contracts, as each covered employee reached age 65. In addition, the report contained a schedule of the estimated annual outlay by the corporation if the seven contracts were not pre-funded in any way and the benefits were merely paid out of current funds as each installment came due; the payments shown by this schedule did not exceed $44,000.00 in any year.

Mr. Gardner informed Company that "(i)t would certainly not be practical, even if possible, to attempt to reduce the benefits which you have already established in the form of your deferred compensation contracts and your qualified pension plan." He then went on to suggest that the seven individual contract holders be included in the group pension plan and that a separate group plan, excluding the first $5,000.00 or $6,000.00 of an employee's annual salary from benefit treatment, be superimposed upon the existing plan. "If these two steps were taken, it would be reasonable to assume that your present individual retirement contracts could be amended so that amounts received from any pension plan would offset the obligations of the corporation under these individual contracts." Mr. Gardner concluded his report by "most strongly recommend(ing) . . . a more detailed study and actuarial review."

State Mutual first got in touch with Mr. O'Brien on December 21, 1965. From this initial contact grew the group pension plan and deposit administration fund contract, which, became effective as of September 1, 1966.

On January 3, 1966, Mr. Kitching of State Mutual wrote to Company stating his intention to propose a plan covering all employees, because he did not believe that the Internal Revenue Service would approve a plan on any other basis. Mr. Mann, noting his agreement that "a retirement plan should cover all employees," sent Mr. Kitching company personnel information, on February 4, 1966, specifically indicating the employees who were not covered by the existing group plan and the seven individuals with contracts. Mr. Kitching's office produced its first proposal; it called for a plan which covered all employees, but, as Mr. Kitching acknowledged, did not attempt in any way to integrate benefits with those for which Company was obligated under the individual contract.

Mr. O'Brien showed the State Mutual proposal to Mr. Gardner. Mr. Gardner pointed out that Company was rushing into an arrangement with State Mutual without first having a consultant make an in depth analysis of Company's employee benefit problems and a comparative study of alternative solutions. Among Mr. Gardner's criticisms were that the proposal provided "only a partial answer to funding your individual contractual agreements." This was followed by restatement of the solution previously recommended, *i.e.*, all employees should be included in the existing qualified group plan, a second group plan providing supplemental benefits for higher salaried employees should be superimposed upon the first and Company should "(n)egotiate with employees holding retirement contracts, whereby a portion of the difference between (a) the amount provided under the two foregoing pensions and (b) the original contract (if any), would be provided by some type of funded deferred compensation agreement."

Mr. O'Brien sent Mr. Gardner's criticisms to Mr. Krock

and again asked for authority to retain a consultant. Mr. Krock ignored the renewed plea for expert advice and sent Mr. O'Brien's letter to Mr. Kitching. Mr. Kitching then offered to "provide 40% of salary as a benefit with the balance being funded out of payroll." He acknowledged that he did not know whether the individual contracts were "formal or informal" and did not indicate what documentation, if any, his funding proposal would require. Mr. Mann again suggested the retention of an expert. Mr. O'Brien again reiterated this advice to Mr. Krock, and Mr. Krock did nothing about it.

On June 29, 1966, Mr. Kitching forwarded to Mr. Krock a revised proposal, for a plan which would provide a retirement benefit equal to 40% of an employee's average salary, reduced by one-fifteenth for each year of service less than fifteen.

O'Brien called in, in early July of 1968, the seven individual contract holders together to explain the State Mutual proposal. His uncontroverted purpose was to convince these employees that they should relinquish their individual contracts. He told the seven that the individual contracts were discriminatory, because they had been given to only a few employees; that the State Mutual plan would be better than the individual contracts, because the plan would be funded; and that, though the individual contracts were valid, the employees would have to go to Court to enforce them, because they represented a $650,-000.00 liability which would bankrupt Company.

In late July Mr. Kitching came to Baltimore to join Mr. O'Brien, Mr. Mann and Leroy W. Shuger in meeting with each of the seven individual contract holders, in turn. The purpose of the meetings was to again seek to persuade the seven to agree to a release of their individual contracts.

Bloom was told that he would not be included under the State Mutual plan unless he agreed to release Company from his individual contract; that he had to be included in the State Mutual plan before the IRS would approve it; that Company would not install a plan unless IRS ap-

proval was assured; and that, by refusing to release his individual contract, he would be depriving his fellow employees of the improved benefits of the State Mutual plan. Bloom expressed dissatisfaction with the proposed plan and the requested agreement to release Company. His objections were the diminution of his benefits and the loss of his protection against wrongful or capricious discharge.

Mr. O'Brien later told Mr. Kitching to increase the plan benefits from 40% to 50%. Instead, Mr. Kitching proposed a formula which provided a monthly benefit equal to 30% of the first $550.00 of an employee's monthly salary plus 50% of the remainder. This still produced a pension benefit that would be less (about 45% of salary) than the benefits provided under Bloom's individual contract.

While State Mutual had been reworking its figures, Bloom and Mr. Levenson and Mr. Levin consulted an independent insurance expert, and Bloom consulted an attorney. One of the possible courses of action which Bloom testified he considered with the insurance expert, was that of agreeing to release his individual contract in exchange for an increase in salary, to enable him to purchase an individual annuity contract producing benefits comparable to those forfeited by the release.

According to Bloom he did not again hear directly from Company regarding the release of his individual contract until March of 1968. Mr. O'Brien, however, testified that he next discussed releases with Bloom and Mr. Levenson, and Mr. Levin, respectively, not long after September 9, 1966. According to Mr. O'Brien, Bloom still refused to release his individual contract; expressed a willingness to be excluded from the State Mutual plan and a preference to have his pension benefits under his individual contract funded separately.

On December 7, 1966, Mr. O'Brien met with the Manager of State Mutual's Washington Office, and asked if it would be possible to exclude the three from the proposed plan by job title but still use the plan's deposit ad-

ministration fund for their individual contracts. The Manager investigated the question through the home office in Worcester and sent Mr. O'Brien a written answer on December 9, 1966:

> "Due to Internal Revenue regulations, we will not be able to use a title exclusion and still fund for the three individuals discussed at our meeting on December 7th. Therefore, the funding will continue for these three individuals and they will be eligible for retirement benefits. It is assumed that they will fulfill their obligations once the plan is revealed in full to them".

Without any further communication with any of the three holdouts, Mr. O'Brien accepted Mr. Fitzgerald's judgment and agreed to the inclusion of the three holdouts in the group plan.

The State Mutual plan, effective as to September 1, 1966, was executed on May 22, 1967. It covers all full-time employees of Company and provides a normal monthly retirement benefit, at age 65 equal to 30% of the first $550.00 of an employee's average monthly earnings during his five highest paid years with Company, plus 50% of the remainder, reduced by one-fifteenth for each year of services less than fifteen. The plan also contains disability, early retirement and termination benefits. Under the early retirement benefit, an employee who has reached age 55 can retire, with the company's consent, and begin to receive immediately his normal retirement benefit, reduced by a factor which takes into account the number of years by which the retirement is early. The termination benefit is a vested benefit for (a) all employees with more than five years of service who were covered by the old group plan and (b) all employees with more than fifteen years of service who were not so covered; it is essentially non-forfeitable, covering employees who quit or are properly discharged; and it is calculated in a manner similar to the early retirement benefit, but is not available until age 65. The State Mutual plan

also contains a survivor option, permitting the designation of any person as contingent annuitant, and options guaranteeing 60 to 120 monthly benefit payments. The plan makes no direct or indirect reference whatsoever to Bloom or any of the individual contracts.

In August of 1967, three months after the State Mutual plan was executed, John E. Mays, Company's Personnel Manager, advised Bloom that there were several options available to him under the new plan and suggested that he contact Mr. Mays for further information. Bloom did so, and examined the State Mutual plan. In October of 1967, he consulted an attorney, who advised him that, upon reaching age 65 he would be entitled to full benefits under both his individual contract and the State Mutual plan.

On September 3, 1967, Mr. Mann addressed a letter to Company's corporate counsel in New York stating that "(a) majority" of the individual contract holders had indicated that they would release their contracts upon adoption of the State Mutual plan. Mr. Mann went on to express his view that the time was ripe "to again approach these employees" and asked what should be done to "officially void and/or cancel these documents." Counsel replied advising that "a general release be executed relative to all of the employees . . . in order to protect the company."

In late March of 1968 Mr. O'Brien unsuccessfully resumed his efforts to obtain Bloom's agreement to release Company from Bloom's individual contract. Mr. O'Brien made another attempt in May. Bloom still refused to sign the release.

On August 6, 1968, Bloom completed and returned to Mr. Mays an evidence of insurability form previously supplied by State Mutual. The executed form was approved by the insurance company on September 12, 1968. On October 28, 1968, Bloom exercised his contingent annuitant option under the State Mutual plan in favor of his wife. Neither the insurability form nor the option form referred to Bloom's individual contract.

In the fall of 1968, Sewell J. Shuger sought to convince Bloom to release his individual contract. They had two meetings in October of that year. At one meeting Sewell J. Shuger told Bloom that all of the other six individual contract holders had signed releases. Bloom refused stating that he was acting on the advice of counsel. In the last meeting, Bloom made it clear that he intended to retire upon his next birthday, when he would reach age 65.

Late in 1968 Dr. Leroy W. Shuger, Bloom's immediate superior, tried to keep Bloom on the job past his retirement. These discussions about post-retirement employment continued through the first half of 1969, but the parties failed to reach any agreement.

In the latter part of February, 1969, Bloom delivered to Dr. Shuger the written opinion of his counsel. Dr. Shuger responded by saying he had never anticipated such a result. Dr. Shuger demanded that Bloom relinquish his individual contract benefits as a condition of his post-retirement employment. In their discussions on March 31, 1969, Dr. Shuger told Bloom that he had been included in the State Mutual plan only because all employees had to be included; Dr. Shuger threatened to stop the State Mutual benefits, if Bloom failed to sign the release. In their discussions on June 24, 1969, Dr. Shuger told Bloom that his salary would have been increased had he previously agreed to release his individual contract rights.

On June 1, 1969, Bloom gave Company formal written notice of his intention to retire on July 1, 1969, and his expectation of receiving full benefits under both the group plan and his individual contract beginning on that date. Mr. O'Brien on June 20, 1969, informed Bloom that he was "entitled to only those benefits as are provided by the State Mutual plan." On July 1, 1969, Bloom retired. On the same day State Mutual issued to Bloom its annuity certificate and made its first payment thereunder.

On October 3, 1969, Company took the position that Bloom was entitled to payments in "the sum of $110.00 per month representing the difference between $931.67, the amount he is entitled to receive under the State Mu-

tual plan had he not exercised the contingent annuitant option, and $1,041.67 which amount Company is obligated to pay under the contract of September 1, 1959." This conforms to the position which Company has taken in the amended answer filed by it immediately prior to trial.

Bloom's contention is that he is entitled to monthly payments under the "deferred compensation agreement" amounting to $1,041.67 which is one-twelfth of 50% of $25,000.00, and he is also entitled to benefits under the State Mutual retirement plan effective September 1, 1966, which amounts to $634.47 (a commutation to a joint and survivor bases of a monthly benefit of $931.67).

Company's contention is that the State Mutual retirement plan is a partial delegation of Company's obligation under the Retirement Plan Contract. Company has recognized this obligation by advising Bloom of its intention to pay him the additional sum of $110.00 per month for his life, that amount being the difference between the State Mutual plan had he not exercised his contingent annuitant option and the monthly amount he was entitled to receive under the 1959 Retirement Plan Contract.

Regrettably Bloom must emerge successful in this case. Counsel and the Court respectively have been completely frustrated in their search for appropriate equitable principals and controlling legal precedents. Thus Bloom springs forth enriched by the largess of Company through Albert A. Shuger as of September 1, 1959, and further enriched by the failure of Company to obtain competent advice [1] before Bloom was included under the State Mutual plan or before he acquired vested rights thereunder. And so Bloom may now enjoy the benefits from two separate and distinct obligations of Company to him.

On September 1, 1959, Bloom agreed in his Retirement Plan Contract to continue to work for Company at least until he reached 65 years of age, and Company made certain benefits available to Bloom. There is no dispute that this is a valid and binding contract under which Bloom

---

1. It should be noted that Charles Yumkas, Esquire, did not represent Company in this matter prior to pending litigation.

has fulfilled all of his obligations. Company sua sponte included him under the State Mutual plan under the apparently mistaken belief that Bloom would have to be included in order for the plan to receive the sanction of the Internal Revenue Service. Company neither actively sought to exclude Bloom in its negotiations with the State Mutual Insurance Company nor is there any evidence before the Court that it sought the advice of legal counsel, a qualified consultant or for that matter even the Internal Revenue Service before it summarily included Bloom together with all of the other company employees. Instead the course of conduct of Company was to include Bloom and to hope that it would be successful through one of its officers in obtaining a release from Bloom in one form or another. Thereafter again, Company, without consulting legal counsel, or any consultant, or the Internal Revenue Service, presented to Bloom a contingent annuitant option form and permitted Bloom to make an election in accordance with the terms of the master contract. Upon reaching retirement, Company thereafter permitted the State Mutual Insurance Company to make the required payments to Bloom. Thus in the opinion of this Court Bloom acquired vested rights in the State Mutual plan. Company now contends that the State Mutual plan should be construed by this Court only as a method of partially funding Bloom's Retirement Income Plan Contract of September 1, 1959; however, Company's course of action up until that "moment of truth" when Bloom informed Company that he felt that he was entitled to both benefits belies that contention. Company's consistent attempt to secure a release from Bloom's individual contract is not the course of conduct of a party who believes that it is delegating at least part of its burden to a third party. Even though it is clear that Company never intended that Bloom should enjoy two pensions, this does not relieve it of the legal obligations that it incurred on September 1, 1959, and September 1, 1966.

It is a well settled principal that it is not the province of a Court of Equity to merge or otherwise modify the

two contractual obligations of Company for the benefit of Bloom. In the case of *Central Savings Bank vs. Post,* 192 Md. 371, the Court of Appeals held on page 381:

> "Equity like the common law, is not a 'brooding omnipresence in the sky.' Equitable principles are applicable to limited subjects in limited circumstances, e.g., fraud, mistake, trusts, fiduciary relations. They may affect the construction or performance of contracts, but ordinarily they do not ignore or override the terms of lawful contracts."

Neither in Bloom's individual contract nor in the master contract of State Mutual Insurance Company are there any provisions for any offset against the respective benefits conferred thereunder. It is interesting to note that an offset was provided in the event of wrongful discharge. It is also interesting to note that no other offset against the retirement benefits is included in the contract. Company's contention that its inclusion of Bloom in the State Mutual plan should be construed by this Court as a partial delegation of its obligation under the 1959 contract is without merit. The persistent request for the execution of a release by Bloom and the attempt to exclude Bloom from the State Mutual plan, feeble as it may have been, shows clearly that Company never intended to attempt to partially delegate its obligation under the 1959 contract. The fact that Bloom possibly could have been excluded by the contract or thereafter by decree of a Court of competent jurisdiction after an adversary proceeding [2] does not relieve Company of the consequences of its action.

Counsel for Company seeks to argue that equity of performance should apply here; however, there is no case law which has been found which would bring this case within the doctrine of equity of performance. The language used by Professor Pomeroy in discussing the doc-

2. Volume 17, Tax Law Review, 545.

trine of equity of performance and equity of satisfaction on page 581 states:

> "Both, however, as well as the doctrine of Election ultimately rest, as it seems to me, upon that broad principle of equity which refuses to admit double benefits to a single recipient by raising a presumption that only one benefit was intended . . .".

However, a careful study of that learned treatise and of the cases cited therein, reveals that this doctrine has not been applied in cases such as the one before this Court.

It is therefore the opinion of this Court that Bloom is entitled to the benefits under the 1959 Retirement Plan Contract and the contingent annuitant option under the State Mutual plan.

/s/ James A. Perrott
JUDGE

Filed:
March 11, 1970